602 P.2d 478

The STATE of Arizona, Appellee,

v.

Marcia Norma BROWN, aka Carren Norwood, aka Matika Palmer, aka Sylvia, Appellant.

No. 4665–PR.

Supreme Court of Arizona, In Banc.

Oct. 17, 1979.

Rehearing Denied Nov. 20, 1979.

Robert K. Corbin, Atty. Gen. by William J. Schafer, III and Lynn Hamilton, Asst. Attys. Gen., Phoenix, for appellee.

John C. Hover, P. C. by Timothy W. Evens, Phoenix and Irwin Klein, New York City, for appellant.

CAMERON, Chief Justice.

This is an appeal from a conviction by a jury of fraudulently obtaining money by scheme or artifice in violation of A.R.S. § 13–320.01,* and a sentence thereon of not less than 4 nor more than 10 years in prison. The Court of Appeals affirmed the conviction and judgment in a memorandum decision. See Rule 48, Rules of the Supreme

---

* Title 13 citations in this opinion are to the Arizona Criminal Code as it existed prior to its extensive revision effective 1 October 1978.

Court, 17A A.R.S. We granted defendant's petition for review, A.R.S. § 12–120.24 and Rule 31.19, Rules of Criminal Procedure, 17 A.R.S., to consider only one question: Was it error to deny defendant's motion for change of judge for cause pursuant to Rule 10.1, Rules of Criminal Procedure, 17 A.R.S.?

The facts necessary for a determination of this matter on appeal are as follows. On or about 1 December 1976, the defendant and an alleged accomplice were arrested for engaging in a fraudulent scheme or artifice in order to obtain money from an elderly victim. The scheme allegedly used to obtain the money is commonly known as a "pigeon drop" which usually takes the form of a young female finding money in the street which she offers to share with an elderly victim and another youthful accomplice to the crime. The elderly victim is asked to produce "good faith" money in order to demonstrate her financial responsibility. Once the money is produced by the victim, it is then stolen by the young female accomplice.

In this case, when the victim removed $6,200 from her savings account, the bank teller notified the police that a pigeon drop was in progress. Defendant and her accomplice were arrested and the money recovered. After being taken into custody, the defendant filled out and signed a release questionnaire. This is a standard form used to determine the terms of a person's release and entitlement to a public defender. By the time of trial, defendant's accomplice had fled the State and had not been located. Defendant was tried alone.

During defendant's testimony at trial, Judge A. Melvin McDonald, by perusing the court file, became aware of inconsistencies between defendant's in-court testimony and written information she had given on the pretrial release questionnaire. At the beginning of the lunchbreak on Friday, 10 June 1977, Judge McDonald handed the entire court file to the prosecutor for review. When the judge "became aware—that nothing was going to happen," he called the prosecutor's supervisor in the County Attor-

ney's Office into his chambers. The judge showed him the questionnaire and explained to him the testimony the defendant had given and how it conflicted in a significant number of areas with the questionnaire. The judge also directed him to investigate perjury charges against defendant. The supervisor then took the questionnaire and discussed it with the prosecutor in order to prepare him for cross-examination of defendant. Defense counsel was not informed of any of these actions by Judge McDonald.

After the trial resumed, the prosecutor made use of the statements contained in the release questionnaire to cross-examine the defendant. Defense counsel promptly objected. The judge overruled the objection. After further discussion concerning the matter, the court finally stated:

"As far as the requirement of the State to disclose that item as an exhibit, I will be candid with you, counsel. Mr. Huffman, who is with the County Attorney's office, and who I did speak with during the recess. When this document came to my attention, I directed him and I asked him to go down to the County Attorney's office to investigate the possibility of instituting perjury prosecution against your client, the reason being that it is clear that the document is under oath.

\* \* \* \* \* \*

"The witness was placed under oath today. I was absolutely flabbergasted, in all candor,—and it is the first time I have ever seen in my court such a flagrant act of perjury.

\* \* \* \* \* \*

"I will at this time direct that her bond be forfeited; that she be held without bond at this time. I am going to direct the County Attorney's office to institute an investigation and to direct them to file perjury charges in this case."

The defendant moved for a change of judge which was immediately heard by another judge. At the hearing before Judge Chatwin, the above comments were read into the record by the court reporter and

Judge McDonald testified as follows regarding the release questionnaire:

"Q  MR. BROADWELL: At anytime, Your Honor, before—I am speaking to Judge McDonald now, at anytime, Judge McDonald, prior to the hearing this afternoon where the County Attorney, Deputy County Attorney, was using this form to cross-examine the defendant, did you at anytime make any mention of the existence of this form to the defense counsel?

"A  No.

       *       *       *       *       *       *

"Q  In fairness to both sides, why not?
       *       *       *       *       *       *

"A  It became clear to me, at least it was my impression that the County Attorney did not know about the information. Having once been in the County Attorney's office, I wouldn't go through the file looking at what criminal defendants have done in a case where the defense attorney generally monitors the records of his client.

"Therefore, it was my thought and I never thought that for example, having worked in that office, I knew that kind of form. I was there four and a half years and I don't think once I had gone through the court file looking at documents in the court file, because I had my own file. I thought that that type of form would be available to you, but the part that concerned me was, I was sitting there in court, I had heard the witness testify. The things that she testified to were diametrically opposed to those things on that form, and there was no way you could reconcile her answer in that form. I was faced with the dilemma which I tossed over in my mind over lunch, what could I do? I didn't make a decision until after she had completed her testimony on your direct. I then went into chambers and Mr. Huffman happened to be up in the office, and I called him in and I

pointed out to him that I had a witness who had testified who in my opinion had committed perjury either in the trial or in the questionnaire. I asked him, 'Have Judges in the past directed the County Attorney's office to file perjury charges, because if that is an appropriate procedure, I am going to do it.'

He said that he thought that they had. I said, 'I am going to do it. Please check into it.'

I showed him the questionnaire and I explained to him the testimony which the defendant had given in court and how it conflicted with the questionnaire in a significant number of major areas where I felt the testimony was in conflict, and I pointed out why to him that I felt that there may be a perjury charge, and asked him to consider it.

At that time he took the file and/or he looked at the questionnaire, I think he took the file with him, and then he—I heard that he was later in conference with Mr. Schwartz. The file was then returned to me and we went back into the courtroom."

Rule 10.1, Arizona Rules of Criminal Procedure, 17 A.R.S., in effect at trial, provided:

"Change of judge for cause

"a.  Grounds. In any criminal case the state or any defendant shall be entitled to a change of judge if a fair and impartial hearing or trial cannot be had by reason of the interest or prejudice of the assigned judge."

▇  We have stated that the right to a fair trial is the "foundation stone upon which our present judicial system rests," and that there is an indispensable right to trial presided over by a judge who is "impartial and free of bias or prejudice." *State v. Neil,* 102 Ariz. 110, 112, 425 P.2d 842, 844 (1967). It is the intent of our rules and statutes in the administration of justice that cases be tried by judges who are not

biased or prejudiced. *State v. Puckett,* 92 Ariz. 407, 377 P.2d 779 (1963). See ABA Standards Relating to the Function of the Trial Judge, Part 1.7 (Approved Draft, 1972). Canon 3(c) of the ABA Code of Judicial Conduct (as amended August 1977) states:

> "(1) A judge should disqualify himself in a proceeding in which his impartiality might reasonably be questioned, including but not limited to instances where:
>
>> "(a) he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding;"

We have no quarrel with a judge notifying the prosecutor when he has reasonable grounds to believe that perjury has been committed. The American Bar Association's Standards of Criminal Justice do not require a judge to sit idly by and allow perjury to be committed without bringing it to the attention of the proper authorities. ABA Standards, supra, Part 1.1. We believe, however, that Judge McDonald acted in such a way that his "impartiality might reasonably be questioned." Canon 3(c), supra.

Judge McDonald gave the appearance of abandoning his role as a fair and impartial judge. After having failed to obtain a satisfactory response from trial counsel, Judge McDonald went "over the trial counsel's head" to his supervisor. His forfeiture or revocation of defendant's bond without a hearing was also improper as the judge himself later realized and corrected. Having discovered the questionnaire and having brought it to the attention of the trial counsel and his supervisor, it is not surprising that he overruled defendant's objection to the admissibility. A judge must be careful never to act in the dual capacity of judge and advocate. *Evans v. Humphrey,* 281 Ky. 254, 135 S.W.2d 915 (1940).

In *In re Guardianship of Styer,* 24 Ariz.App. 148, 151, 536 P.2d 717, 720 (1975), our Court of Appeals defined judicial bias as "a hostile feeling or spirit of ill-will," or "undue friendship or favoritism towards one of the litigants." Judge McDonald's actions gave an appearance of "a hostile feeling or spirit of ill-will" towards the defendant. A judge should avoid even the appearance of partiality. *Taylor v. Hayes,* 418 U.S. 488, 94 S.Ct. 2697, 41 L.Ed.2d 897 (1974); ABA Standards, supra, § 1.7.

So much of the decision of the Court of Appeals as relates to the disqualification of the trial judge is vacated. The matter is reversed and remanded for new trial.

STRUCKMEYER, V. C. J., and HAYS, HOLOHAN and GORDON, JJ., concurring.