Argued and submitted February 4, accused reprimanded June 16, 1981

In Re: Complaint as to the conduct of
**ROBERT M. BURROWS,**
*Accused.*
(OSB 77-1, SC 27331)
629 P2d 820

Robert A. Lucas, Rainier, argued the cause for the Accused. With him on the brief was Lucas, Petersen & Huffman, Rainier.

Randolph Lee Garrison, Roseburg, argued the cause for the Oregon State Bar. With him on the brief were Thomas Garrison and James A. Arneson, Roseburg.

PER CURIAM.

**PER CURIAM.**

Robert M. Burrows, District Attorney, and William D. Hostetler, Deputy District Attorney of Josephine County, are accused by the Oregon State Bar of unethical conduct in the criminal proceedings against one Steven McAllister.

On June 13, 1976, at about 10:30 p.m. two people armed with a rifle robbed the "Why Not" market in Grants Pass, Josephine County, Oregon. The robbers fled the scene and were not apprehended.

On December 8, 1976, a 15 year old Grants Pass high school student claimed she was forcibly raped on that date by Steven McAllister.[1] There was evidence that the victim and other female students skipped school, voluntarily entered McAllister's place of residence and smoked marijuana shortly before the alleged rape. On December 10, 1976, the victim took a polygraph examination which indicated that she had told the truth when she said that she had been forcibly raped. McAllister, who was 26 or 27 years of age, was arrested on December 13, 1976, on an information charging him with first degree rape filed by Hostetler as Deputy District Attorney. McAllister was arraigned on the following day and Brian J. Hawkins, an attorney in Grants Pass, was appointed to represent him.

Hostetler told Hawkins that he had some doubts about proving a first degree rape case because of his reservations about the victim's credibility as to force and resistance. Hostetler had visited with Burrows about the case and Burrows thought that there was room to negotiate. Hawkins took the position that the first degree rape information should be dismissed and McAllister should be charged with a lesser crime. Hawkins would then be willing to negotiate the lesser charge.

On December 23, 1976, a lengthy preliminary hearing was held in the District Court of Josephine County on the first degree rape information. Hawkins, as attorney for McAllister, was given the opportunity to cross examine the alleged victim and the state's other witnesses. The

---

[1] For the most part our recital of the facts is condensed from the opinion of the Disciplinary Review Board.

District Court found that there was probable cause to believe that McAllister had committed the crime of first degree rape and "bound him over" to the Circuit Court. McAllister was released from custody on a conditional release.

On February 17, 1977, the grand jury of Josephine County indicted McAllister for the June 13, 1976, armed robbery of the "Why Not" market. On the following day McAllister was arrested and placed in jail when he could not raise the $25,000 security amount. At the time of his arrest McAllister made a partial confession of his participation in the armed robbery. He admitted that he had driven the getaway car, but claimed that he was not inside the market at the time of the holdup.

Five days later, on February 22, 1977, McAllister told Josephine County Deputy Sheriff Dickson and Oregon State Trooper Assmus that he wanted to talk to Hostetler. McAllister wanted to make a "deal" wherein he would be released from custody to engage in undercover work on the local drug scene in exchange for a reduction or dismissal of the pending rape and robbery charges.

The police officers arranged the requested meeting in Hostetler's office. At the beginning of the meeting McAllister waived his *Miranda* rights. Hostetler informed McAllister that the rape case would not be discussed because McAllister was represented by an attorney in that case. Hostetler made no promises to McAllister. It was agreed that McAllister would be required to take a polygraph test to determine his knowledge of the drug traffic as a condition to his release to engage in undercover work. At the end of the meeting the police officers, in Hostetler's presence, told McAllister that he should not inform his attorney, Hawkins, of the proposed undercover work. Nothing was done or said by Hostetler to countermand the police officers' statement.

On February 23, 1977, McAllister was arraigned in the Circuit Court on the robbery charge. The state was represented at the arraignment by Deputy District Attorney Seitz. Hawkins was appointed to represent McAllister on the robbery charge in addition to the rape charge.

Late in the afternoon of February 25, 1977, Trooper Assmus told Hostetler that McAllister had successfully "passed" the polygraph examination and that the police urgently wanted McAllister released from custody that night. The truth was that at that time no examination had been given, and the police wanted McAllister released so that he could help them catch a criminal who had escaped from custody earlier in the day. Hostetler referred the request from the police to Burrows.

Burrows contacted the circuit judge in his chambers on an *ex parte* basis, without the knowledge of Hawkins, and had McAllister's security amount reduced from $25,000 to $2,500. McAllister, with the help of a relative, posted the required security and was released. At this point, both Burrows and Hostetler thought that McAllister had passed a polygraph examination as to his knowledge of the local drug scene. Burrows specifically told the police officers to inform Hawkins of McAllister's release from jail and the agreement to work undercover. The police officers deliberately failed to inform Hawkins of the undercover work on the grounds that Hawkins could not be "trusted." It was the police officers' opinion that the undercover work and McAllister's safety would be "jeopardized" if they followed Burrows' instructions and told Hawkins. McAllister agreed that his attorney, Hawkins, should not be told about the undercover police work.

Early in the evening of February 25, 1977, after his release from jail, McAllister was given a polygraph examination by the police. This examination was confined solely to McAllister's connection with the armed robbery charge and did not concern his knowledge of the local drug traffic. The officer who conducted the examination told McAllister that his answers were deceptive to three critical questions. McAllister then admitted that he had not told the truth.[2]

Two months plus later, on April 29, 1977, Officers Assmus and Dickson met with Burrows to discuss the

---

[2] Neither Burrows nor Hostetler knew that a polygraph examination directed solely to the armed robbery had been conducted until after the institution of these disciplinary proceedings. A copy of the report of the examination was not given to the District Attorney's office by the police.

progress of the undercover drug work. McAllister's work had been instrumental in a number of drug arrests. During this meeting Burrows learned for the first time that Assmus and Dickson had deliberately failed to inform Hawkins that McAllister was working undercover for the police. This information distressed Burrows. In his words: "I saw red. * * * I was dead hot and those police officers knew it." Burrows immediately called Hawkins to his office and told him what had happened and inquired as to what should be done. Hawkins replied that he would have to talk to McAllister.

On May 5 or 6 Burrows and Hawkins reached a tentative negotiated plea agreement whereby (1) McAllister would plead guilty to the armed robbery charge, (2) the rape charge and a second count of robbery would be dismissed, and (3) the District Attorney would recommend a five-year sentence.

On June 9 and June 15, 1977, McAllister testified before the Josephine County grand jury in regard to his knowledge of the drug activities that he had discovered as a result of his undercover work.

On June 29, 1977, McAllister entered a plea of guilty to the armed robbery charge and was given a five-year sentence. The rape charge and the remaining robbery charge were dismissed in accordance with the negotiated plea.

On August 11, 1977, Hawkins filed a complaint in letter form with the Oregon State Bar, complaining about the conduct of Burrows and Hostetler in the McAllister cases. The Oregon State Bar filed individual amended complaints against both Burrows and Hostetler, accusing each of unethical conduct in violation of the established standards of professional conduct.

The amended complaints against Burrows and Hostetler contained five separate causes of complaint. The charging part of each may be summarized as follows:

> **First cause.** On February 22, 1977, the Accused made or knew of the arrangements for a polygraph examination to be taken by Steven McAllister on February 25, 1977, without the knowledge or advice of Brian J. Hawkins, who

had been appointed to represent McAllister on rape and robbery charges.

**Second cause.** That for a period from February 18 to April 29, 1977, the Accused failed to notify Hawkins that a depu conceal such contacts and dealings from Hawkins.

**Third cause.** On February 25, 1977, the Accused participated in arrangements for the reduction of "bail" and release for McAllister without notice to and without the knowledge or advice of Hawkins.

**Fourth cause.** On May 5, 1977, and June 9, 1977, the Accused made arrangements for McAllister to appear as a witness before the grand jury without the knowledge and consent of Hawkins.

**Fifth cause.** The Accused charged and prosecuted McAllister for committing Rape in the First Degree, when they knew and believed the facts would only support a lesser charge and that such action would merely harass McAllister.

The trial of Burrows and Hostetler was held jointly before the Trial Board of the Oregon State Bar. The Trial Board found both Burrows and Hostetler not guilty of all causes of complaint except the second cause. It found both of the Accused guilty of the second cause—failure to notify Hawkins that the district attorney's office and the police had repeated contacts and a course of dealing with McAllister, and that they concealed the same from Hawkins.

The Disciplinary Review Board in effect considered the first and second causes of complaint together and then found both Burrows and Hostetler guilty in that they "violated DR 7-104(A)(1) by communicating, or causing others to communicate, with McAllister without obtaining Hawkins' consent." The Board of Review recommended "that each of the Accused be publicly reprimanded." It found both of the Accused not guilty of the third, fourth, and fifth causes of complaint.

The disciplinary rule under which Burrows and Hostetler were found guilty is as follows:

"DR 7-104   Communicating With One of Adverse Interest.

"(A)   During the course of his representation of a client a lawyer shall not:

> "(1) Communicate or cause another to communicate on the subject of the representation with a party he knows to be represented by a lawyer in that matter unless he has the prior consent of the lawyer representing such other party or is authorized by law to do so.
>
> "* * * * *"

Burrows did not make or know of the arrangements for the polygraph examination to be taken by McAllister on February 25, 1977. The first and only information Burrows ever received about the polygraph was in the afternoon of February 25 when he was falsely told that McAllister had "passed" the examination. At that time the examination had not been given. Therefore, Burrows is not guilty of the first cause of complaint.

The allegations of the first cause of complaint are specific allegations as to particular acts concerning the polygraph examination, whereas the allegations of the second cause of complaint are general allegations as to a course of conduct. The allegations of the second cause of complaint include the allegations of the first cause of complaint. For that reason we consider Hostetler's action in connection with the arrangements for the polygraph examination of McAllister only under the second cause of complaint.

In regard to the second cause of complaint, Burrows and Hostetler contend that the communications with McAllister did not relate to the rape or robbery but to the separate subject matter of undercover drug activities. They further contend that Burrows on February 25, 1977, clearly, distinctly, and explicitly instructed the police officers to inform Hawkins as to what had taken place and the fact that McAllister was going to engage in undercover work for the police. It is Hostetler's contention that after February 25 he had no further contact with McAllister or the under- cover police work.[3]

---

[3] Hostetler also argues: "The law has long permitted a defendant to waive counsel on a new subject matter even though he has counsel on another matter. See, e.g., *State v. Atteberry,* 39 Or App 141 (1979); *State v. Shoemaker,* 41 Or App 357 (1979); * * *." The Oregon State Bar correctly points out that this argument confuses the law of suppression of evidence with the ethical duties of attorneys.

The opinion of the Disciplinary Review Board as to the charges of violating DR 7-104(A)(1) is as follows:

"We believe that the Accused place an unreasonably narrow interpretation on the words 'subject of the representation,' as used in DR 7-104(A)(1). A criminal charge has two basic elements, guilt and sanction. It had to be obvious to the Accused that McAllister was seeking favorable treatment in the disposition of the pending charges, such as the dropping or reducing of certain charges and leniency with respect to the District Attorney's recommended sentencing. It is entirely possible, if not probable, that an accused needs competent legal counsel representation during the evolution of an agreement for leniency in exchange for cooperation with law enforcement agencies. McAllister was likely as concerned about the ultimate sentence that would be imposed or the charges that might be reduced or dropped as he was about the probabilities of a conviction. For all we know, if Hawkins had been involved in the February 22 and 25, 1977 discussions, an even better arrangement could have been struck in McAllister's behalf. It is quite clear that McAllister was laboring under some interpretations of his 'agreement' which were quite different than those held by the police or the Accused. This type of misunderstanding would likely be avoided, or less likely to occur, if both sides were represented by competent counsel at all important stages. In short, we think that where it was clear that McAllister's undercover drug activities were likely to, or at least were expected to, impact the pending criminal charges, the subject matter of the communications necessarily involved the pending criminal charges.

"Further, we are not aware of any rule of law or principle which enables an attorney to excuse his failure to obtain an opposing attorney's consent by delegating the task to non-lawyers who, albeit deceptively, failed to follow through with their instructions. It would be difficult to hypothecate a set of circumstances which better illustrate the folly and danger of a principle of ethics which would permit a lawyer to excuse his misfeasance or nonfeasance by delegating to, and then later blaming, a non-lawyer. The overzealous and at times deceptive conduct of one or more of the police officers involved in this episode aptly illustrate the point.

"In any event, by the time the police officers were instructed to 'inform Hawkins,' two proscribed meetings

had been held and the die was practically cast. Hawkins merely would have been presented with a *fait accompli.*

"In our opinion, both attorneys violated DR 7-104(A)(1) by communicating, or causing others to communicate, with McAllister without obtaining Hawkins' consent."

■■ We agree with the Disciplinary Review Board and find both Burrows and Hostetler violated DR 7-104(A)(1) by communicating, or causing others to communicate, with McAllister without Hawkins' consent. We also find that Hostetler acted to conceal the communications by his failure to countermand the police officers' suggestion to McAllister that he not tell Hawkins. These violations are within the allegations of the second cause of complaint.[4]

The Oregon State Bar concedes that the evidence will not support a finding of guilt as to Hostetler on the third and fourth causes of complaint.

■ In regard to the third cause of complaint, the Oregon State Bar contends that Burrows' *ex parte* application to the circuit judge to obtain a reduction in the security amount for McAllister was to the merits of the cause and a violation of DR 7-110(B):

"In an adversary proceeding, a lawyer shall not communicate, or cause another to communicate, as to the merits of the cause with a judge or an official before whom a proceeding is pending * * *."

■■ The Bar argues that the words "on the merits" refer to the content of the communication by counsel to the judge and not to a phase of the proceedings. It further argues that the evils of *ex parte* contact are that (1) the judge may be improperly influenced, and (2) the judge may be inaccurately informed. We agree.

The reduction of the security amount so that McAllister could be released from jail was an essential step in the plan to have McAllister engage in undercover work on

---

[4] The Oregon State Bar did not charge Burrows and Hostetler with violating ORS 135.405(2):

"The district attorney shall engage in plea discussions or reach a plea agreement with the defendant only through defense counsel, except when, as a matter of record, the defendant has effectively waived his right to counsel or, if the defendant is not eligible for court-appointed counsel, has not retained counsel."

the local drug scene. Although the agreement or understanding on the undercover work was indefinite, McAllister expected that he would receive favorable treatment by way of dismissal of charges or reductions of sentences. The District Attorney's office was interested in having McAllister do the undercover work in hope that he might furnish information on the local drug traffic. When Burrows contacted the circuit judge he was talking to the judge who, in the normal course of events, would in the future pass sentence on McAllister. Burrows told the judge that McAllister was being released to do undercover work for the police and innocently misinformed him that McAllister had "passed" a polygraph examination. Burrows' *ex parte* contact with the judge involved more than a reduction of the security amount. It also included information which the judge could use down the road in passing sentence upon McAllister. The fact that, by hindsight, it appears that Burrows' communications with the judge were favorable to McAllister is immaterial. In the context of this case we find the *ex parte* contact was "on the merits" of the proceedings. We find that Burrows is guilty of the third charge in violating DR 7-110(B).

On oral argument in this court it was brought to our attention that Burrows did not send Hawkins a copy of the written order reducing the security amount. Although the Oregon State Bar has not charged Burrows with a neglect of duty in this regard, it appears a copy of the order might have alerted Hawkins to inquire if there was a change of status as to his client.

■ The fourth cause of complaint alleges that Burrows made arrangements for McAllister to appear as a witness before the grand jury without the knowledge or consent of Hawkins. In effect, both the Trial Board and the Disciplinary Review Board found that the Oregon State Bar had not carried its burden of proof and that Burrows was not guilty of the fourth cause. We agree.

■ The fifth cause of complaint alleged that Burrows and Hostetler charged and prosecuted McAllister for committing Rape in the First Degree when they knew and believed that the facts would only support a lesser charge.

DR 7-103(A) provides as follows:

"A public prosecutor or other government lawyer shall not institute or cause to be instituted criminal charges when he knows or it is obvious that the charges are not supported by probable cause."

In this case we need not speculate whether there was "probable cause" to support the charge against McAllister of first degree rape. It appears that the same information that the Accused had was presented to the District Court of Josephine County at McAllister's preliminary hearing, and the court, by "binding him over," necessarily found that information sufficient to establish the existence of probable cause. We find both Burrows and Hostetler not guilty of the fifth cause of complaint.

We find Burrows and Hostetler both guilty of violations within the allegations of the second cause of complaint. We find Burrows guilty of the violation alleged in the third cause of complaint. This opinion will serve as a public reprimand.

The Oregon State Bar is awarded costs.