728 P.2d 273

**Harvey R. McELHANON, Jr., and Doreen T. McElhanon, his wife, Plaintiffs-Appellees Cross-Appellants,**

v.

**Robert Ong HING and Alice Hing, his wife, Defendants-Appellants Cross-Appellees.**

**No. CV 86 0128–PR.**

Supreme Court of Arizona, En Banc.

Nov. 3, 1986.

Reconsideration Denied Dec. 16, 1986.

Jack E. Evans, Ltd. by Jack E. Evans, Phoenix, for plaintiffs-appellees cross-appellants.

Feinstein Halstead & Leonard, P.A. by Allen L. Feinstein, R. Stewart Halstead, Phoenix, for defendants-appellants cross-appellees.

FELDMAN, Justice.

This case arises from a series of actions alleging fraud, embezzlement, and conspiracy surrounding the formation of a corporation in 1970. In this particular case, plaintiff (petitioner McElhanon), a judgment creditor, alleged a conspiracy to defraud and named the judgment debtor's attorneys as defendants. The sole issue before us is whether an ex parte conference between the trial judge, plaintiff, and plaintiff's attorney requires reversal of a jury verdict in plaintiff's favor. The court of appeals held that the trial judge erred in denying a mistrial motion based on the ex parte contact. *McElhanon v. Hing*, 151

Ariz. 386, 400, 728 P.2d 256, 270 (1985). We accepted review pursuant to Rule 23, Ariz.R.Civ.App.P., 17A A.R.S. We have jurisdiction under Ariz. Const. art. 6, § 5 and A.R.S. § 12–120.24.

## I. FACTS

### A. *The Underlying Transaction*

In the summer of 1970, Harvey R. McElhanon, Jr. (McElhanon), John H. Greer, Jr. (Greer), and Charles Gilbert Harris (Harris) purchased stock in several corporations that acquired and operated four restaurants. The first restaurant purchased, Pinnacle Peak Patio, became the principal asset of Southwest Restaurants Systems, Inc. (Southwest), a new corporation formed by McElhanon, Greer, and Harris. All three principals contributed cash for the Pinnacle Peak Patio transaction. Although only McElhanon and Greer contributed cash for stock in the other corporations, each of the three men became owners of one-third of the stock in all the corporations. In return for McElhanon's and Greer's disproportionate capital contributions, Harris agreed to pay for his stock out of the corporations' profits. A formula was devised to determine the amount of Harris's obligation to McElhanon and Greer; the men agreed that the obligation would be forgiven if there were no profits.

### B. *McElhanon v. Harris and Greer*

In the fall of 1970, disputes arose among the three shareholders. McElhanon filed suit against Harris, Greer, and the corporations, demanding payment of $250,000 based on the formula and Harris's prior promise to pay his debt from profits. McElhanon also sought damages against Greer for maliciously interfering with Harris's obligation to pay and for committing, with Harris, acts of malfeasance and misfeasance in operating the corporations.

Shortly after the suit was filed, John Grace (Grace), counsel for Greer and Harris, began consulting with attorney Robert Ong Hing (Hing), defendant in this case. In September 1973, McElhanon's lawsuit against Greer and Harris went to trial with Hing representing Greer and Harris. On October 11, the jury returned a $200,000 verdict for McElhanon against Harris based on the repayment formula. The jury found Greer not liable. The following day, October 12, 1973, judgment on the verdict was entered in favor of McElhanon and against Harris.

The sequence of events following the verdict led to McElhanon's present claim against Hing. McElhanon alleges that after being informed of the verdict, Greer and Harris went to Hing's office to discuss the matter. Hing knew that Harris's only asset was his interest in Southwest. McElhanon alleged that to prevent collection of the judgment, Greer and Harris decided to have Greer purchase Harris's stock. Hing prepared a sale agreement to that effect. Harris's stock certificate in Southwest was cancelled and a new stock certificate was issued in Greer's name. The transaction was completed by October 13, 1973, the day after entry of judgment. As security for his legal fees from Greer and Harris, Hing retained Greer's Southwest stock certificates, the agreement between Greer and Harris, and the Greer-to-Harris note and assignment. McElhanon later claimed that the transfer of stock from Harris to Greer and Hing's assertion of an attorney's lien on the stock and the proceeds of the transfer were fraudulent transactions facilitated by Hing and Grace.

On October 20, McElhanon served a writ of garnishment naming the corporations as garnishee-defendants. When the writ was answered, McElhanon learned that Harris's stock had been transferred to Greer, that Greer was indebted to Harris, and that Hing claimed an attorney's lien on the proceeds. McElhanon sought to set aside the sale of stock from Harris to Greer. Hing opposed McElhanon, arguing that Harris was not insolvent. McElhanon claims that Hing knew this to be untrue. Eventually, the order to show cause was dismissed. On November 14, Harris appealed the judg-

ment against him.[1] While the appeal was pending, Southwest filed a reorganization petition under Chapter XI of the Bankruptcy Act and Harris and Greer filed voluntary bankruptcy petitions.

In the bankruptcy proceedings, McElhanon sought a determination that he was entitled to a judgment lien on the stock that Harris had sold to Greer. The law firm of Stockton and Hing opposed McElhanon's claim, arguing that it had a prior right to the stock by way of a retaining lien for its fees. It also claimed that Southwest was indebted to it for services rendered in defending McElhanon's action against Harris and Greer. Eventually, the bankruptcy court ruled that the October 13 stock transfer was a fraudulent conveyance and that the stock in Southwest was an asset of Harris's estate. The court also ruled that Hing had no claim against Southwest for legal services. These and other findings were upheld on appeal. *In re Southwest Restaurant Systems, Inc.*, 607 F.2d 1241 (9th Cir.1979); *In re Southwest Restaurant Systems, Inc.*, 607 F.2d 1243 (9th Cir. 1979), *cert. denied*, 444 U.S. 1081, 100 S.Ct. 1035, 62 L.Ed.2d 765 (1980).

### C. *The Present Action*

### *McElhanon v. Hing, Grace, and Greer*

McElhanon filed the present case on September 23, 1975. He alleged that Hing and Grace had conspired with Harris and Greer to defraud him and had taken affirmative steps to hinder and prevent execution on his 1973 judgment against Harris. The trial was long and bitter; emotions engaged the attorneys as well as the parties. Toward the end of trial, the judge informed defendants' counsel that he wished to have a private meeting with plaintiff and his attorney. There was no objection, and the meeting took place in the judge's chambers. The subjects discussed went beyond those originally proposed by the judge. Defendants eventually moved for a mistrial, but the judge denied the motion and

the trial continued. The jury was instructed that they could find against Hing if they found that he *knowingly* assisted his clients, Harris and Greer, to commit a fraud on McElhanon. Fraud was defined as "action of an affirmative, evil nature, such as ... acting dishonestly, intentionally, maliciously and deliberately, with a wicked motive to deceive and cheat...." On August 14, 1980, the jury returned a verdict of $286,120.

Implicit in the jury verdict is a finding that the stock transfer and lien transactions between Harris, Greer, and Hing were intentionally fraudulent. With respect to Harris and Greer, this finding is strengthened by the holdings in the two bankruptcy matters, *In re Southwest Restaurant Systems, Inc., supra*, and *In re Southwest Restaurant Systems, Inc., supra*. As far as Hing's knowledge is concerned, we agree with the conclusion of the court of appeals:

> The circumstantial evidence [at trial] strongly indicates that Hing drafted the stock transfer agreement and participated in the transfer discussion, knowing that Harris was or would be rendered insolvent, knowing that Greer was financially unstable if not insolvent, knowing that the consideration was inadequate and that the stock transfer agreement itself was a sham, and with the actual intention on Hing's part of hindering, delaying, and defrauding McElhanon. Additionally, based upon the delay occasioned by Hing's acts and those of his co-conspirators, including the looting of the corporation by the co-conspirators, the value of the stock subsequently decreased so as to give rise to a cause of action for money damages by McElhanon....

151 Ariz. at 395, 728 P.2d at 265.[2]

After judgment was entered against Hing and Grace, McElhanon settled with Grace and agreed not to execute against

---

1. The judgment was eventually affirmed, *sub nom., Perry v. McElhanon*, No. 1 CA–CIV 2635 (Ariz.Ct.App. Sept. 9, 1976) (memorandum decision).

2. For those who wish to learn even more of the sad history of this affair, *see United States v. Greer*, 607 F.2d 1251 (9th Cir.), *cert. denied*, 444 U.S. 993, 100 S.Ct. 526, 62 L.Ed.2d 423 (1979).

him. Hing's motions for a new trial and for judgment notwithstanding the verdict were denied and he appealed. McElhanon also appealed on the issue of damages.

## D. *Decision of the Court of Appeals*

 The court of appeals decided numerous issues, only one of which is before us. First, it determined that a cause of action lies against a judgment debtor's attorney who conspires to defraud the judgment creditor. The court found sufficient evidence to support the finding that Hing knowingly participated in such a conspiracy. At 395, 728 P.2d at 265. It then determined that the proper measure of damages was the value of the property fraudulently conveyed or the amount of the debt, whichever was less. *Id.* at 394, 728 P.2d at 264. The court found that all elements of the tort were adequately stated in the instruction. *Id.* at 396, 728 P.2d at 266.

 On procedural issues, the court held that the trial judge did not abuse his discretion when he denied Hing's motion to sever the case. It further held that Evans, McElhanon's trial counsel, had acted improperly by repeatedly mentioning the prior bankruptcy judgment in front of the jury. However, relying on *Grant v. Arizona Pub. Serv.*, 133 Ariz. 434, 454, 652 P.2d 507, 527 (1982), the court of appeals found that the trial judge did not abuse his discretion in denying a mistrial because Evans's misconduct had not influenced the verdict.[3] 151 Ariz. at 399, 728 P.2d at 269. We approve the foregoing holdings together with the supporting analysis.

The court of appeals then reached the issue under review. It decided that the trial judge's denial of the mistrial motion based on ex parte contacts was an abuse of discretion. Addressing only that issue, we turn first to the specific facts surrounding the conference.

## E. *The Ex Parte Contacts*

In the fourth week of trial Evans attempted to impeach defendant Hing with prior deposition testimony. Hing objected to some of Evans's questions. His objection was sustained, possibly because the trial judge misunderstood Evans's question to the witness. A recess was called. In chambers, with all parties present, Evans objected strenuously, claiming that the judge was hostile to him and that this hostility was being communicated to the jury. He also took umbrage at a perceived accusation that he was guilty of misrepresenting the facts. A heated exchange occurred.

The next morning, the judge read the disputed portions of the record. Evidently wishing to spread oil on troubled waters, he told defense counsel that he was going to have a private conference with McElhanon and Evans to explain that he did not believe Evans was guilty of any ethical improprieties. Defense counsel made no objection. McElhanon and Evans were alone with the judge in chambers. However, at Evans's request a court reporter transcribed the proceedings.

The judge explained that he was not accusing Evans of improprieties. His feelings not assuaged, Evans expanded the subject of the conference by accusing Hing and his counsel of perjury. McElhanon also related hearsay about one of the defendants lying on the witness stand and accused both Grace and Hing of fraud. He requested that bar proceedings be brought against defendants and defense counsel. The judge explained that "my [only] role in this case is to insure that plaintiff and defendants get a fair trial...."

After a short recess, counsel for all parties met in the judge's chambers. The judge apologized for any accusations of impropriety against Evans and described the serious allegations of perjury and subornation that had been made against defendants. Defense counsel requested that

---

**3.** Whatever the extent of the impropriety in Evans's references to the bankruptcy proceeding, that impropriety presumably was rendered harmless when the judgments in bankruptcy were subsequently admitted in evidence.

the judge avoid further ex parte discussions. The court reporter read the transcript of the previous discussion. The proceedings then adjourned at defense counsel's request.

Defense counsel subsequently argued that the ex parte proceedings had violated the Code of Judicial Conduct and had affected the judge's view of the case. He questioned the judge's impartiality. The judge stated that the allegations of perjury were irrelevant to the matter before him and that he felt unaffected by plaintiff's allegations. However, the judge conceded that he was concerned about appearances, and that he wanted to ensure both sides a fair trial. Defense counsel moved for a mistrial on grounds of impropriety and judicial misconduct. The judge declared a recess to discuss the matter with the presiding judge.

When the court reconvened, the judge repeated his previously expressed views but, fearing an appearance of impropriety, he also stated that he was inclined to grant the motion for a mistrial. Evans urged the judge to reconsider his decision. He claimed that it would be a miscarriage of justice to retry the case a month into the trial when the jury knew nothing of the events and the judge had repeatedly stated that his view of the case was unaffected. The judge then denied the motion for mistrial, stating that he found no clear violation of professional conduct, that he had invested an enormous amount of work in the case, and that his impartiality was unaffected by the allegations.

## II. DISCUSSION

### A. *Improprieties in the Proceedings*

 The court of appeals held that the ex parte conference was improper. At 401–402, 728 P.2d at 271–272. We agree. The rule is that

"[e]xcept as authorized by law, [a judge should] neither initiate nor consider ex parte applications concerning a pending or impending proceeding."

Canon 3(A)(4), Code of Judicial Conduct, Rule 81, Ariz.R.S.Ct., 17A A.R.S.; *see also Roberts v. Commission on Judicial Performance*, 33 Cal.3d 739, 747, 661 P.2d 1064, 1068, 190 Cal.Rptr. 910, 914 (1983); *In re Fisher*, 31 Cal.3d 919, 647 P.2d 1075, 184 Cal.Rptr. 296 (1982); *Matter of Berk*, 98 Wis.2d 443, 297 N.W.2d 28 (1980). The rule is unaffected by the judge's good faith belief that he had been hasty in chastising plaintiff's attorney. One reason such contacts are improper is that no matter how pure the motive any ex parte contact may allow the judge to be improperly influenced or inaccurately informed. *In Re Conduct of Burrows*, 291 Or. 135, 145, 629 P.2d 820, 826 (1981).

The error was not cured by the judge either telling opposing counsel of his intentions or obtaining consent for the ex parte contact. Counsel reasonably might feel constrained from objecting to the judge's request for a conference. Canon 3(A)(4), *supra*, does not permit the judge to solicit a party's consent for the judge's ex parte discussions with another party; rather, it prohibits the judge from initiating ex parte communications about the pending case. In our view, the judge's solicitation of consent is a form of initiation. Nor can we give weight to the judge's desire to apologize to counsel for a misunderstanding. If a judge wishes to mend his fences during trial, he must invite all parties inside the gate. The events that took place in this case illustrate the dangers of even innocently conceived ex parte meetings.

 The court of appeals correctly noted that the judge was not alone in acting improperly. 151 Ariz. at 401, 728 P.2d at 271. Evans never should have agreed to the ex parte conference. DR 1–103, 7–110(B), Rule 29(a), Ariz.R.S.Ct., 17A A.R.S.[4] Furthermore, Evans's *expansion* of the content of the ex parte contact to include perjury allegations was improper.

---

4. The events in question occurred prior to adoption of the Rules of Professional Conduct, Rule 42, Ariz.R.S.Ct., 17A A.R.S. Therefore, discipli-

nary rules are cited to the Code of Professional Responsibility, Rule 29(a), Ariz.R.S.Ct., 17A A.R.S.

He also had a duty to restrain his client from injecting potentially prejudicial hearsay into the conversation. *Cf.* DR 7–110(B).[5] We understand, but cannot condone, the reluctance of an attorney to refuse to confer when "requested" to do so by the trial judge.

### B. *Is Reversal Required?*

The court of appeals held that when the trial judge denied the motion for a mistrial, he "lost control of the case and there could no longer be a fair and impartial trial." At 400, 728 P.2d at 270. The court held that the ex parte contacts were unauthorized by law and "totally destroyed the sanctity of a fair trial." *Id.* at 401, 728 P.2d at 271. It also found that the impropriety had affected the outcome of the trial because, after the ex parte conference, the judge changed his mind and submitted the punitive damage issue to the jury. *Id.* at 402, 728 P.2d at 272.

Thus, the court of appeals made two related holdings. First, prejudice was presumed because of the nature of the improprieties. Second, "the impropriety of this ex parte proceeding [may have] affected the outcome of the trial," *id.* at 402, 728 P.2d at 272, thereby prejudicing defendant.

### 1. *Presumed Prejudice*

■ The court of appeals relied on *Grant v. Arizona Pub. Serv., supra.* We reaffirm in the strongest terms our statement in *Grant* that we will not hesitate to require retrial when a trial judge loses control of a case and allows counsel to engage in conduct that precludes a fair trial. The issue is whether a fair trial was possible in this case.

*Grant* considered cases in which prejudice was presumed. For example, in *Love v. Wolf,* 226 Cal.App.2d 378, 38 Cal.Rptr. 183 (1964), prejudice could not be demon-strated, but a serious impropriety had occurred without the court admonishing the jury. The record in *Love* showed that the court had lost control of the entire proceedings, allowing counsel to engage in conduct described by the appellate court as "egregious beyond any in our experience or ... related in any reported case...." 226 Cal. App.2d at 382, 38 Cal.Rptr. at 184. *Grant* held that under such circumstances, prejudice could be presumed and that we would "have no hesitancy in finding that denial of a motion for a new trial was an abuse of discretion." 133 Ariz. at 456, 652 P.2d at 529; *see also Simmons v. Southern Pacific Transp. Co.,* 62 Cal.App.3d 341, 133 Cal. Rptr. 42 (1976); *Ice v. Commonwealth,* 667 S.W.2d 671 (Ky.1984) (judge allowed numerous acts of prosecutorial misconduct, including permitting the state to call a minister to testify in rebuttal that the death penalty was approved by biblical teaching and that jurors would be condemned by God if they failed to recommend defendant's execution), *cert. denied,* 469 U.S. 860, 105 S.Ct. 192, 83 L.Ed.2d 125 (1984).

In this case, all improprieties occurred outside the jury's presence. The jury was never aware that anything untoward had occurred. Except for the one ex parte conference, serious as it was, the trial judge did not permit continual episodes of misconduct by counsel. Unlike *Love* and *Ice,* the trial judge here sustained well-taken objections, struck improper remarks, and properly admonished and instructed the jury. Except for the ex parte conference, the record shows a trial judge who kept control of a very difficult case, rather than one who lost control. In a long and hard fought case, even "[s]killed advocates are not always endowed with 'high boiling points.'" *Love v. Wolf,* 226 Cal.App.2d at 393, 38 Cal.Rptr. at 192. This was not a case where loss of control created a virtual

---

**5.** We can criticize McElhanon almost to the same extent as Evans. The judge invited McElhanon to a private conversation and McElhanon was led into the inner sanctum by his own attorney. While most laymen might feel it was perfectly proper to take advantage of the golden moment to make the judge see the true nature of the opposition, it is fair to assume that McElhanon, who by virtue of this series of disputes has more litigation experience than most lawyers, knew better. In addition, McElhanon made racial slurs about Hing. We condemn his remarks.

mockery of the concept of a fair and impartial trial. *Cf. Love v. Wolf, supra.* We do not believe the rule of presumed prejudice mentioned in *Grant* is applicable.

### 2. *Appearance of Impropriety*

 Hing argues that reversal is required because the appearance of impropriety affected the integrity of the judicial process. Even where there is no actual bias, justice must appear fair. *State v. Romano,* 34 Wash.App. 567, 569, 662 P.2d 406, 407 (1983) (citing *In re Murchison,* 349 U.S. 133, 75 S.Ct. 623, 99 L.Ed. 942 (1955)). By definition, ex parte contacts are rarely on the record and, therefore, are usually unreviewable. Thus, such contacts cast doubt upon the adversary system and give the appearance of favoritism. *See In re Burrows,* 291 Or. 135, 145, 629 P.2d 820, 826 (1981).

 We do not believe the events that occurred here threaten the integrity of the judicial process. The trial judge gave notice of his intentions and no objection was made. When the ex parte conference ended, the trial judge immediately notified the opposing parties of the plaintiff's accusations and the expanded scope of the ex parte proceeding. The transcript of that proceeding was read to defendants and they were allowed to respond. Arguments were had over the propriety of the ex parte conference. The judge reiterated his statements of impartiality and repeatedly stated that he viewed the allegations against Hing as irrelevant to the issues before him.

In *State v. Brown,* 124 Ariz. 97, 602 P.2d 478 (1979), we reversed a verdict entered after a trial judge had initiated ex parte conversations with a prosecutor concerning possible perjury. The judge insisted, on more than one occasion, that perjury charges be brought against a defendant because he was offended that the perjury was so blatant. Defense counsel was not notified about the ex parte contacts until the judge had revoked defendant's bond.

We do not believe *Brown* controls this case. In *Brown,* the judge "gave the appearance of abandoning his role as a fair and impartial judge" and began "to act in the dual capacity of judge and advocate." 124 Ariz. at 100, 602 P.2d at 481. We held that reversal is required when a judge becomes so personally involved that there is an appearance of hostile feeling, ill will, or favoritism toward one of the litigants. *Id.* No such appearance was given in this case. *Compare State v. Mincey,* 141 Ariz. 425, 444, 687 P.2d 1180, 1199 (judge had ex parte contact regarding the difficulty of sentencing), *cert. denied,* 434 U.S. 1343, 105 S.Ct. 521, 54 L.Ed.2d 56 (1984) *with State v. Valencia,* 124 Ariz. 139, 140–41, 602 P.2d 807, 808–09 (1979) (relative of victim had private conversation with judge and urged imposition of death sentence; the judge told no one, no contemporaneous record was made, and the information imparted pertained to *facts* relevant to the sentencing procedure).

The present case is similar to *State v. Perkins,* 141 Ariz. 278, 686 P.2d 1248 (1984). In *Perkins,* we noted that the trial judge "remained neutral and did not make a judgment" after receiving letters alleging perjury from a codefendant. 141 Ariz. at 286, 686 P.2d at 1256. The trial judge informed counsel that he would provide a fair trial and that counsel would have to use his own judgment regarding the use of potentially perjured testimony. 141 Ariz. at 286–87, 686 P.2d at 1256–57. We held that the judge showed no prejudice, especially because he conferred with other judges after receiving the letters and then told all counsel involved. *Id; see also United States v. Jackson,* 430 F.2d 1113 (9th Cir.1970) (revocation of bail bond on information received in ex parte communication did not require disqualification).

Here, as in *Perkins,* the judge never lost the appearance of impartiality. In his efforts to remain neutral, he even consulted the presiding judge, a completely proper course of conduct. *See* Canon 3(A)(4), Code of Judicial Conduct, Rule 81, Ariz.R.S.Ct., 17A A.R.S.; *State v. Perkins,* 141 Ariz. at 287, 686 P.2d at 1257; *Gaston v. Hunter,* 121 Ariz. 33, 59, 588 P.2d 326, 352 (1978).

**412**

Appearances might have been different if the events that transpired at the ex parte conference had been hidden from defendants. However, the contemporaneous *record* shows that when plaintiff, not the judge, expanded the scope of the conference, the judge asserted his independence and impartiality and then terminated the conference, promptly informing defendants of the allegations made against them. Thus, unlike *State v. Valencia,* the ex parte communication did not provide the judge with new and unrebutted factual information on the very issues that he was to decide. While the conference was improper, *see ante* at 396, 728 P.2d at 266, we do not believe the essential fairness of the entire proceeding was left in question. No appreciable doubt was cast upon the integrity of the judicial process.

Defendant argues that the nature of the accusations made to the judge at the ex parte conference were calculated to adversely influence his views of the defendant and, therefore, the appearance of impropriety rule requires reversal. We disagree. The accusations did not come as a surprise to the judge; similar charges had been made in open court. A judge often hears prejudicial evidence, allegations, or accusations against one party. Judges are trained to hear and consider such information and, if they find it irrelevant or inadmissible, to put it aside and discharge their duties in accordance with the law. We need not reverse merely because the judge heard the derrogatory comments made by McElhanon in chambers. If reversal would be required here, then a similar argument could have been made when the judge heard McElhanon's comments in open court, or if he had heard extremely prejudicial evidence in a motion to suppress and ruled it inadmissible. *United States v. Meinster,* 488 F.Supp. 1342, 1348–49 (S.D. Fla.1980), *aff'd,* 664 F.2d 971 (5th Cir.1981), *cert. denied,* 457 U.S. 1136, 102 S.Ct. 2965, 73 L.Ed.2d 1354 (1982).

Defendant argues that justice must not only be done fairly but that it must be perceived as having been fairly done. We agree. Anything else tends to undermine public confidence in the judicial system. This principle, however, does not help defendant in the case at bench. The transactions giving rise to this case commenced almost seventeen years ago. The first legal action was filed over fifteen years ago. The alleged conspiracy formed at Hing's office occurred thirteen years ago. The case now before us was filed eleven years ago. During this period of time, the parties have been involved in at least three superior court lawsuits, two of which were tried, one arbitration proceeding, and three hotly contested adversary trials in bankruptcy court. There have been five federal appeals,[6] three appeals in our appellate system, and two previous petitions for review by this court.[7] There have been five petitions in this court seeking extraordinary relief by special action.[8] There have been two petitions for writ of certiorari from the United States Supreme Court.[9]

The parties have had more than their day in court. There comes a time when every case must end; otherwise, the process becomes more important than the resolution. We would not affirm the verdict if a significant appearance of judicial impropriety ex-

6. *In re Southwest Restaurant Systems, Inc.,* 607 F.2d 1237 (9th Cir.1979); *In re Southwest Restaurant Systems, Inc.,* 607 F.2d 1241 (9th Cir. 1979); *In re Southwest Restaurant Systems, Inc.,* 607 F.2d 1243 (9th Cir.1979) *cert. denied,* 444 U.S. 1081, 100 S.Ct. 1035, 62 L.Ed.2d 765 (1980); *In re Southwest Restaurant Systems, Inc.,* 607 F.2d 1248 (9th Cir.1979); *United States v. Greer,* 607 F.2d 1251 (9th Cir.), *cert. denied,* 444 U.S. 993, 100 S.Ct. 526, 62 L.Ed.2d 423 (1979).

7. *Hing v. Southwest Restaurant Systems, Inc.,* 1 CA–CIV 4058 (Ariz.Ct.App. Mar 1, 1979) (memorandum decision); *Perry v. McElhanon,* 1 CA–

CIV 2635 (Ariz.Ct.App. Sept. 9, 1976) (memorandum decision); and the present case.

8. *McElhanon v. Superior Court,* Supreme Court No. 11505 (1974); *McElhanon v. Superior Court,* Supreme Court No. 11557 (1974); *McElhanon v. Superior Court,* Supreme Court No. 12462 (1976); *Hing v. Chatwin,* Supreme Court No. 13208 (1977); *Hing v. Chatwin,* Supreme Court No. 13690 (1978). Jurisdiction was declined in each case.

9. *See* note 6, *supra.*

isted. However, we believe that given the long history of this case, reversal based on mere appearance of impropriety, without any actual prejudice, would significantly undermine the integrity of the judicial system. This sequel to the saga of the Hatfields and McCoys has had all of the scrutiny that the judicial system can afford. It is time to put an end to this affair unless the impropriety actually prejudiced the result.

### 3. *Actual Prejudice*

█ Finally, therefore, we must determine if there is a reasonable probability that defendant was prejudiced as a result of the ex parte communication. *State v. Brown*, 124 Ariz. 97, 100, 602 P.2d 478, 481 (1979); *see also State v. Packett*, 206 Neb. 548, 552, 294 N.W.2d 605, 608 (1980).

Defendant argues that prejudice can be found because, after the perjury accusation made at the ex parte conference, the judge decided to give a punitive damages instruction. We disagree. When asked earlier in the trial, the judge had stated that sufficient evidence had not yet been produced to warrant an instruction on punitive damages. After the conference and by the close of McElhanon's case, he had changed his mind. If the jury had awarded punitive damages there might be some force in the argument that a significant possibility of prejudice existed when the judge decided to give the punitive damage instruction. However, the jury awarded *no* punitive damages. Therefore, there is no possibility that defendant sustained prejudice.

The verdict was obviously not the result of passion or prejudice. The jury denied all punitive damages and brought in a verdict well within reason on the compensatory claim. The verdict of $286,000 is not based on intangible items such as pain and suffering; it is the approximate amount of the loss sustained by McElhanon because of his inability to collect the $200,000 judgment awarded against Harris in 1973. As the court of appeals indicated, 151 Ariz. at 394, 728 P.2d at 264, the trial court correctly instructed that the amount of damages recoverable was limited to the amount of the antecedent debt which McElhanon was unable to collect from Harris plus incidental expenses. The compensatory damages awarded were within the limits of the court's instructions and of *defendant's own* proposed jury instruction. No possible bias affecting the jury instructions has been demonstrated. The key instructions on the legal issues were correct statements of the law. Of more than forty instructions given to the jury, all but one were in the form submitted by defendant. The misconduct did not prejudice defendant.

### III. CONCLUSION

Review of the entire record leads to the inescapable conclusion that at long last justice in this case has been done. Ariz. Const. art. 6, § 27. All parties have had their day in court and it is time to bring this matter to a final conclusion. We approve the decision of the court of appeals except as to its determintion that reversal was required because of the ex parte communications. That portion of the opinion is vacated. The judgment of the trial court is affirmed.

HOLOHAN, C.J., GORDON, V.C.J., and HAYS and CAMERON, JJ., concur.