142 P.3d 249

**In re the Marriage of KAY S., Petitioner–Appellant,**

v.

**MARK S., Respondent–Appellee.**

**No. 1 CA04–0343.**

Court of Appeals of Arizona, Division 1, Department D.

Sept. 7, 2006.

As Amended Nov. 9, 2006.

Reconsideration Denied Sept. 27, 2006.

Paul G. Ulrich, P.C., By Paul G. Ulrich, Pamela B. Petersen and DeeAn Gillespie & Associates By DeeAn Gillespie, Phoenix, Attorneys for Petitioner–Appellant.

Udall Shumway & Lyons, P.L.C. By Steven H. Everts, David R. Schwartz, Mesa, Attorneys for Respondent–Appellee.

## OPINION

SNOW, Judge.

¶ 1 Kay S. ("Mother") appeals the denial of her requests both to vacate the trial court's rulings and to receive a new trial. Mother's contention is based on an alleged appearance of impropriety that resulted from the service by the attorney for Mark S. ("Father") as a judge pro tempore in the Maricopa County Superior Court division in which her dissolution proceeding was conducted. For the following reasons, we conclude that, on the facts of this case, an appearance of impropriety did exist. Because we cannot determine that the Presiding Family Court Judge's failure to vacate the trial court's rulings on the issues of which Mother complains was harmless, we remand those rulings for independent reconsideration by the family court with instructions.

## BACKGROUND

¶ 2 In December 2002, Mother filed a petition for dissolution. Shortly thereafter she claimed a need for protection from Father for herself and the couple's three children

because, she alleged, some years earlier Father had displayed suicidal ideations and, on one occasion, endangered the life of their oldest child during the course of either an attempt to feign suicide or an actual suicide attempt.

¶ 3 Mother had also recently copied the web history and accessed files from Father's computer that established that Father had been viewing pornographic websites on the internet. Mother confronted Father with that use. She further alleged that the titles of some of the files copied suggested that Father might be viewing child pornography, thus putting her children in danger of molestation from Father.[1]

¶ 4 Father denied any viewing of child pornography, any past attempts or current ideations of suicide or that he presented any danger to his children or Mother. He also denied regular or continuing viewing of pornography. To resolve Mother's request for protection without conceding the facts alleged, the parties stipulated that Father would reside at his parents' home during the period prior to trial and would have limited visitation with his children. The parties also requested the family court judge, Judge Oberbillig, to set an early trial date and to dismiss the emergency order of protection entered against Father. The court set an early trial date for July 8, approximately four and a half months later.

¶ 5 The court subsequently appointed Dr. Marlene Joy as the court's custody evaluator. In making her recommendation Dr. Joy had joint and separate counseling sessions with the children and the parents. She had access to relevant materials. She also consulted with Mother's expert, Dr. Steven Gray, a specialist in pornography addiction and its effects.

¶ 6 Dr. Gray discussed with Dr. Joy research indicating that excessive use of pornography was correlated with an inability to achieve emotional intimacy and, if established in Father, would suggest a diminished ability to parent. He indicated to Dr. Joy that the extent of any potential problem could be in part determined by the extent and types of pornography Father viewed.

¶ 7 A month before trial, Dr. Joy participated in a conference call with Mother's counsel, DeeAn Gillespie, and Father's counsel, Steven Everts. In that conference call, the parties discussed how to address Mother's concern about Father's pornography viewing. Dr. Gray had recommended either a battery of psychological tests or obtaining a polygraph from Father. A third alternative was to obtain the hard drive on Father's computer to assess the frequency and content of his viewing of pornographic websites.

¶ 8 After the conference call, Father's counsel agreed to consider providing Father's computer as the preferable way to address Mother's concerns. Mother's counsel made arrangements to have the computer hard drive analyzed by a forensic expert. However, when after a week, Father had not provided the computer, Mother filed, on June 16th, an expedited motion to continue trial for sixty days. She further subpoenaed Father's computer from his employer. Father responded to Mother's emergency motion to continue, and, on June 26, Judge Oberbillig denied Mother's motion to continue without comment.

¶ 9 In her custody evaluation, which she provided to the parties a few days before the scheduled July 8 trial, Dr. Joy addressed Mother's various concerns about Father. She discounted Mother's apprehension about Father's potential for suicide. As to Mother's concerns related to Father's pornography viewing, Dr. Joy observed that Father admitted only isolated incidents and claimed that he never viewed pornography in the presence of the children. She referred to her consultation with Dr. Gray in which "he referred to recent data which shows some potential correlation between 'pornography use to sexual abuse or problems with intimacy,'" and further noted "he claims a significant issue to be considered is the frequency, amount and kind of pornography that is involved." But Dr. Joy also observed that

---

1. Mother asserts on appeal that "she never contended [Father] was a potential child molester." However, the record plainly demonstrates that she did. See, e.g., Mother's Emergency Petition for Clarification and/or Modification of Parenting Time and Child Support, Pendente Lite at ¶¶ 3–5.

"[a]ccording to Dr. Gray, the burned CD of the web history from Father's computer was 'pretty straight up' and not 'deviant' or reportable to the police." She further noted that "the Gilbert police viewed the burned CD of Father's web site history and found no deviancy."

¶ 10 Although indicating that additional factors might also be relevant to her consideration if she had time and resources to consider them, Dr. Joy ultimately recommended that Father be granted joint custody and a significantly expanded parenting schedule from his stipulated pretrial parenting time. She recommended that both parents continue with individual counseling, cooperate on health matters pertaining to the children, and "consult and seek agreement with one another regarding any extra activity which may affect the other parent's access."

¶ 11 The one-day bench trial was held as scheduled on July 8, 2003. Dr. Joy's custody evaluation was admitted in evidence. The trial court also heard the testimony, among others, of Mother, Father, Dr. Gray, Dr. Holyoak and Mother's father who, together with his spouse, had made a substantial gift to the parties to pay down the mortgage on their marital home.

¶ 12 During his testimony Dr. Gray restated what he had told Dr. Joy in their earlier consultations. He acknowledged that not everyone who occasionally views pornography has a personality disorder or a "characterlogic" trait. He further acknowledged that he had not examined Father so he could not testify one way or another whether Father had a "characterlogic" problem that might affect his parenting. He also stated that the subject matter of the pornography viewed and the frequency and duration of Father's viewing were relevant factors in determining the existence and extent of any personality disorder or problem that could be correlated to pornography use. He testified that persons who have such dysfunctions can benefit through counseling and that persons who view pornography are frequently in denial about their behavior.

¶ 13 Dr. Holyoak testified that he had counseled with both Father and Mother and that, while Father had viewed pornography

in the past, Father admitted as much and sought treatment for it. He did not perceive Father to be in denial, and, while acknowledging that Father had some issues with intimacy, he thought Father was an effective parent for his children.

¶ 14 The day after the bench trial, Gillespie received an unscheduled telephone call while she was out of town from Judge Oberbillig and Everts. They were calling from Judge Oberbillig's chambers to further discuss the case.

¶ 15 Two days later, on July 11, Judge Oberbillig issued an unsigned minute entry in which he stated his findings, awarded Father and Mother joint legal custody of their three minor children, ordered the parties to share major decisions involving the children, and granted almost equal parenting time to the parties. Additionally, he denied Mother's request for production of Father's computer hard drive. He did not order Father to engage in counseling related to his viewing of pornography.

¶ 16 Over Father's objections, Judge Oberbillig determined that Mother had not acted unreasonably in failing to return to work and awarded her $1200.00 a month for spousal maintenance and $432.00 a month for child support. Although he ruled on some property division issues, including a determination that the parties would equally share the equity of the home, the property division was not completely resolved.

¶ 17 On August 21, 2003, while in Judge Oberbillig's court on another matter, Gillespie noticed Everts' name written on Judge Oberbillig's calendar as a judge pro tempore. According to an affidavit that Gillespie subsequently filed with her motion to disqualify Judge Oberbillig, Judge Oberbillig's staff then told her that Everts was the division's "preferred" judge pro tempore who frequently served in lieu of Judge Oberbillig and on whom the staff relied and preferred above any other substitute.

¶ 18 On September 23, Mother moved to disqualify Judge Oberbillig because it created at least an appearance of impropriety for Judge Oberbillig to preside over matters in

which Everts represented a party before him because Everts was the division's preferred pro tempore.[2] She further moved to vacate Judge Oberbillig's determinations with respect to her dissolution.[3] Judge Oberbillig referred the motion to Judge Armstrong, the Presiding Family Court Judge at the time.

¶ 19 Judge Armstrong heard oral argument on the motion and directed Everts to submit an affidavit detailing the hours served as a pro tempore judge in Judge Oberbillig's division. According to Everts' affidavit, he served in Judge Oberbillig's division as follows during the year prior to trial:

| | |
|---|---|
| October 23, 2002: | four hours |
| December 6, 2002: | three and one-half hours |
| December 12, 2002: | four and one-half hours |
| March 10, 2003: | six and one-half hours |
| April 9, 2003: | six hours and forty-five minutes |
| April 28, 2003: | three and one-half hours |
| May 23, 2003: | three hours and fifteen minutes |
| June 17, 2003: | six and one-half hours (emergency coverage with one other *pro-tem* for all family law judges and the commissioner's calendar for Orders of Protection as a result of a judicial conference) |
| June 27, 2003: | six hours |

¶ 20 Although Judge Armstrong opined that it was a close question, he found that there was no appearance of impropriety under the facts of the case because Everts' service as a judge pro tempore in Judge Oberbillig's court "was sporadic." Thus, Judge Armstrong apparently found that Everts was explicitly authorized to appear before Judge Oberbillig by Arizona Rule of Supreme Court ("Rule") 81, Application D(3) (hereinafter "Application D(3)"). On that same basis, Judge Armstrong declined to vacate the previous rulings of Judge Oberbillig, but he did determine that Judge Oberbillig should not continue to sit on the dissolution matter, and he reassigned the matter to Judge Willrich for all further proceedings.

¶ 21 The decree of dissolution signed by Judge Willrich was entered on January 8, 2004; the decree mirrored the findings and rulings of Judge Oberbillig. Mother filed a timely motion for new trial. Judge Willrich denied the motion. In doing so she reviewed the trial transcript and evidence "to analyze the request in light of determining whether

sufficient evidence was presented to [Judge Oberbillig's] Court to sustain its ruling." She determined that such evidence existed. Mother timely appealed from the decree of dissolution and from the order denying her motion for new trial. We have jurisdiction pursuant to Article 6, Section 9 of the Arizona Constitution and Arizona Revised Statutes ("A.R.S.") sections 12–2101(B) and (F)(1) (2003).

## ANALYSIS

¶ 22 This appeal presents two central issues: (1) whether Judge Armstrong erred in determining that Everts' service as a judge pro tempore in Judge Oberbillig's court did not create an appearance of impropriety; and (2) if an appearance of impropriety was created, whether Judge Armstrong erred in refusing to vacate Judge Oberbillig's determinations made after trial.

¶ 23 Because the issue requires an interpretation of provisions of the Arizona Code of Judicial Conduct, Ariz. R. Sup.Ct. 81, our review with respect to the superior court's

**2.** Mother does not question Everts' good faith in providing pro tempore service. She acknowledges in her initial pleadings for disqualification that "his public service is probably worthy of commendation."

**3.** Mother learned of Everts' status in Judge Oberbillig's court on August 21, 2003, but she did not file her motion to disqualify until September 23, 2003. Judge Armstrong treated Mother's motion as an affidavit for change of judge for cause. Father argues that under the rule governing

changes of judge for cause, Arizona Rule of Civil Procedure 42(f)(2)(C), Mother was required to file her affidavit within twenty days of learning of cause for Judge Oberbillig's removal. Father, however, did not present this argument below. Therefore, we do not consider it on appeal. *See, e.g., Dillig v. Fisher*, 142 Ariz. 47, 51, 688 P.2d 693, 697 (App.1984) (argument not presented before trial court may not be presented for first time on appeal).

interpretation of the rule is *de novo. See Schwab Sales, Inc. v. GN Constr. Co.,* 196 Ariz. 33, 35, ¶ 3, 992 P.2d 1128, 1130 (App. 1998) (interpretation of court rule is reviewed *de novo* ).

## A. The Appearance of Impropriety

■ ¶ 24 Rule 81, Application D establishes standards of conduct for pro tempore part-time judges. Applications D(3) and D(4) of Rule 81 specifically regulate the appearance of attorneys in specialized court divisions in which they have served as part-time judges pro tempore. Those provisions exist to "allow the greatest possible use of part-time pro tempore judges ... while minimizing any potential for the appearance of impropriety." Ariz. R. Sup.Ct. 81, Application (Commentary [subsec. D] ).

¶ 25 Application D(3) makes clear that an attorney's one-time or sporadic service as a judge pro tempore does not prevent the attorney from appearing as a lawyer in the same specialized division of the court. "A pro tempore part-time judge who serves once or only sporadically in a specialized division of a court ... may appear as a lawyer in such specialized division or court during such service." [4]

¶ 26 Application D(4) makes clear, however, that a part time pro tempore judge who serves "repeatedly on a continuing scheduled basis" in the specialized division cannot ap-

pear within the specialized division during the term of that service. "A pro tempore part-time judge who serves repeatedly on a continuing scheduled basis in a specialized division of a court ... shall not appear as a lawyer in such specialized division or court during such service." *Id.*

¶ 27 Mother argues that these two rules should be interpreted together to cover the entire range of possible pro tempore service. Thus, she argues that if Everts' service as a judge pro tempore was not "sporadic" pursuant to Application D(3), then it must have been "repeated[ ] on a continuing scheduled basis" pursuant to Application D(4). Father inversely argues that because his lawyer's pro tempore service did not occur "repeatedly on a continuing scheduled basis" pursuant to Application D(4), then his service must be "sporadic" and therefore his appearance in Judge Oberbillig's division is explicitly authorized by Application D(3).

¶ 28 Neither party's interpretation of the operation of the two rules is correct. As we do with statutes, we interpret court rules according to the plain meaning of the words that constitute them. *Ariz. Dept. of Revenue v. Superior Court,* 189 Ariz. 49, 52, 938 P.2d 98, 101 (App.1997). The Presiding Family Court Judge ruled that Judge Oberbillig had no need to disclose Everts' service as a pro tempore judge in his division because Everts' service in that division was "sporadic." [5] As

---

4. Father argues that we need not decide whether there was an appearance of impropriety because Mother waived this issue by not asserting it in a timely manner. Everts notes that on April 9, 2003, Mother's first attorney, Paul Riggs, appeared before him while he was serving as a judge pro tempore in Judge Oberbillig's division. Father insists that notice of his pro tempore service was thus imputable to Mother, citing *S Dev. Co. v. Pima Capital Mgmt. Co.,* 201 Ariz. 10, 21, ¶ 31, 31 P.3d 123, 134 (App.2001). Assuming Riggs' knowledge of Everts' pro tempore service is chargeable to Mother, Application D(3) permits Everts to appear in Judge Oberbillig's court so long as his service as a judge pro tempore in that division was one-time service or was "sporadic." Thus, Riggs' knowledge that Everts served once as a judge pro tempore in Judge Oberbillig's court is not a sufficient basis on which to argue that Mother was earlier aware of, and hence waived, any argument that Everts' service was sufficient to present an appearance of impropriety.

5. In determining whether Everts' service in a "specialized division" had been sporadic, the rule obliges the court to consider all Everts' service as a pro tempore within the entire family court as a "specialized division" of the Maricopa County Superior Court. While Maricopa County Superior Court is divided "into as many judicial divisions as there are judges," Ariz. Local R. Prac.Super. Ct. (Maricopa) 1.2(a), the court is divided into only seven "specialized" divisions. *Id.* at 1.2(b). "The Court shall consist of the following specialized divisions: (1) Civil; (2) Criminal; (3) Domestic Relations; (4) Juvenile; (5) Presiding Judge; (6) Probate; and (7) Special Assignment." *Id.* Thus, in making his determination that Everts' service was "sporadic" under the rule, the court should have considered all of Everts' service within the specialized domestic relations division of Maricopa County Superior Court. That "specialized division" is commonly referred to as the family court. To conform with current usage, we will identify it as such and refer to separate divisions within that specialized court as divisions of family court.

the Arizona Supreme Court Judicial Ethics Advisory Committee ("JEAC") has noted, however, " '[s]poradic' means 'at irregular intervals,' and in the context of the quoted provision also carries the implication of being 'infrequent.' " JEAC Opinion 02–06 at 5 (September 21, 2002). *See* also Websters II New Collegiate Dictionary 1068 (2001) (defining "sporadic" as "occurring in isolated instances"). We accept this definition.

¶ 29 While nothing in the record suggests that Everts' service in Judge Oberbillig's court occurred at regular intervals, such service was not infrequent. The month immediately prior to Mother's trial, Everts served in Judge Oberbillig's division as a judge pro tempore twice for two full days. One of those days was the day after Judge Oberbillig had denied Mother's motion to continue the trial. Everts also served for a half day in May, and twice for one and a half days in April, a month in which significant pretrial motions were filed with Judge Oberbillig and heard by him. All told, Everts served nine times in the eight months prior to trial. Thus, while Everts' service in Judge Oberbillig's division was not at regular intervals, his service was repeated and was not infrequent. Because sporadic service must be both irregular and infrequent, Everts' service in Judge Oberbillig's court was not sporadic, and thus his appearance in Judge Oberbillig's courtroom was not explicitly authorized by Application D(3).

¶ 30 Neither, however, did Everts serve "repeatedly on a continuing scheduled basis" as a judge pro tempore. Mother suggests that Everts served as Judge Oberbillig's on-call judge pro tempore, and thus his service was regular and even regularly scheduled. There is no support for that assertion in the record. Although there is evidence that Judge Oberbillig's chambers would call Everts on occasions when it needed a pro tempore judge, there is no evidence that he agreed to serve as the "on call" pro tempore

for Judge Oberbillig's division at any time during a particular period that Judge Oberbillig needed a judge pro tempore. *See, e.g.,* JEAC Opinion 02–06 at 5 ("A judge who is 'on call' is subject to being called in for duty; periods of being 'on call' may be regularly scheduled, and may be frequent or infrequent depending on the needs of the court."). Nor is there anything in the record that indicates a regular pattern to Everts' service in Judge Oberbillig's division or in the specialized division of the family court.

¶ 31 Application D(3) by its terms only authorizes attorneys who have appeared sporadically in a specialized division to continue to appear in that specialized division. Application D(4) only prohibits an attorney who serves "repeatedly on a continuing scheduled basis" from appearing in that specialized division. Thus, Everts' appearance in Judge Oberbillig's division was neither explicitly authorized pursuant to Application D(3) nor explicitly prohibited by Application D(4).[6] We are thus left to determine in light of Rule 81, Canon 3(E)(1)(a) whether Judge Oberbillig's "impartiality might reasonably be questioned." We conclude that in these circumstances, it may.

¶ 32 In *State v. Salazar,* 182 Ariz. 604, 898 P.2d 982 (App.1995), Salazar's attorney began representing the trial judge's former secretary in a wrongful termination action against the trial judge in another court. Salazar moved to disqualify his trial judge based on an appearance of impropriety. *Id.* at 607, 898 P.2d at 985. A visiting judge denied the motion, and Salazar was ultimately convicted. *Id.* On appeal, we determined that while there was no showing of actual bias, there was an appearance of impropriety. *Id.* at 609, 898 P.2d at 987. We thus reversed Salazar's conviction. *Id.*

¶ 33 In so doing we noted "[a]ny circumstances that objectively lead to the conclusion that the judge's impartiality might reasonably be questioned calls for disquali-

---

6. Mother also argues that Everts' service as a judge pro tempore violates the provisions of Maricopa County Superior Court Administrative Order No.2004–062 (May 6, 2004) which imposes certain limits on an attorney's service as a part-time judge pro tempore and requires that court administration, as opposed to individual divi-

sions of the court, schedule such service. Mother asks us to take judicial notice of that order, and find that Everts' service violated it. We decline to consider this argument because the order was not in effect at the time of Everts' relevant service.

fication. This objective standard extends beyond the judge's personal belief that his impartiality is not impaired...." *Id.* at 608, 898 P.2d at 986 (quoting American Bar Association Committee on Ethics and Professional Responsibility, Informal Op. 1477 (citation omitted)); *see also* Ariz. R. Sup.Ct. 81, Canon 2 (Commentary (Canon 2A) (1993)) ("The test for appearance of impropriety is whether the conduct would create in reasonable minds a perception that the judge's ability to carry out judicial responsibilities with ... impartiality ... is impaired.").

¶ 34 Here Everts neither represented nor opposed Judge Oberbillig. Nevertheless Judge Oberbillig's staff asked Everts to stand in Judge Oberbillig's place in fulfilling his judicial responsibilities. At the time, Maricopa County Superior Court administration allowed, if it did not require, each judge's division to select its own judges pro tempore. And Judge Oberbillig's division repeatedly requested and obtained Everts' service during a period when Everts was appearing before Judge Oberbillig on behalf of Father despite the availability of other pro tempore judges. As a result, Everts served as a pro tempore judge in Judge Oberbillig's court at times when Judge Oberbillig was ruling on motions in which Everts represented Father. This includes Everts' day-long service for Judge Oberbillig the day after Judge Oberbillig had denied Mother's request to continue trial. At trial, Everts referred to his familiarity with the operation of Judge Oberbillig's chambers. Further, the day after trial, Judge Oberbillig made an unscheduled call to opposing counsel with Everts in his office to further discuss the matter with Mother's counsel. Also, Judge Oberbillig's division staff subsequently identified Everts as their "favorite pro tempore" to Mother's counsel.[7] Together these circumstances give rise to a reasonable perception, whether correct or not, of both professional association and special access between Judge

Oberbillig and Everts. Under such circumstances a person might reasonably question Judge Oberbillig's impartiality.

¶ 35 We do not find any actual bias on the part of Judge Oberbillig. But "[e]ven where there is no actual bias, justice must appear fair." *Salazar,* 182 Ariz. at 608, 898 P.2d at 986 (quoting *McElhanon v. Hing,* 151 Ariz. 403, 411, 728 P.2d 273, 281 (1986), *cert. denied,* 481 U.S. 1030, 107 S.Ct. 1956, 95 L.Ed.2d 529 (1987)). In other words, "justice must not only be done fairly but ... it must be perceived as having been fairly done." *McElhanon,* 151 Ariz. at 412, 728 P.2d at 282; *see Salazar,* 182 Ariz. at 609, 898 P.2d at 987 ("Although we do not conclude that the judge was actually biased against defendant or defense counsel, that is immaterial. The judge should have been disqualified based on the appearance of partiality."). The unique circumstances of this case "create in reasonable minds a perception that the judge's ability to carry out judicial responsibilities with ... impartiality is impaired." Ariz. R. Sup.Ct. 81, Canon 2 (Commentary (Canon 2A) (1993)). Thus, Judge Armstrong should have disqualified Judge Oberbillig.

### B. The Risk of Injustice Requires Reconsideration of the Decree

■ ¶ 36 In *Salazar,* after determining that the superior court erred in not disqualifying the trial judge, we noted that "[w]hether a judgment should be vacated based on the failure to disqualify the judge depends on: (1) the risk of injustice to the parties; (2) the risk that denial of relief will result in injustice in other cases; and (3) the risk of undermining public confidence in the judicial process." 182 Ariz. at 609, 898 P.2d at 987 (citing *Liljeberg v. Health Servs. Acquisition Corp.,* 486 U.S. 847, 864, 108 S.Ct. 2194, 100 L.Ed.2d 855 (1988)).[8]

---

7. Although a judge may assign to his staff the responsibility of obtaining pro tempore judges, the judge cannot avoid the appearances that his staff's decisions and comments create. Rule 81, Canon 3(C)(2) ("A judge shall require staff, court officials and others subject to the judge's direction and control to observe the standards of

fidelity and diligence that apply to the judge and to refrain from manifesting bias or prejudice in the performance of their official duties.").

8. *Liljeberg,* the case from which we adopted this three-factor test, was also a civil case.

¶ 37 The final two factors, the risk of injustice in other cases and the risk of undermining public confidence in the judiciary, are not the most significant ones here. But when, as here, the service of pro tempore judges in the various superior courts of this state is subject to varying administrative practices, allowing attorneys who serve as pro tempore judges to appear before the courts in which they serve without careful evaluation of the extent and circumstances of that service could give rise to both injustice in other cases and a diminished sense of public confidence in the impartiality of the judiciary. Nevertheless, the principal question here, as it was in *Salazar*, is the risk of injustice to the parties.

¶ 38 In *Salazar*, we found that there was sufficient risk of injustice to Salazar arising from the broad range of evidentiary rulings made by the judge at trial, at least one of which was erroneous. We therefore reversed his conviction. There is no jury to make factual findings in a family court. Thus, a family court judge plays a larger role in entering a decree of dissolution than a criminal division judge plays in arriving at a verdict in criminal matters. The risk of injustice resulting from a judge's rulings is heightened when the judge is the finder of both fact and law and when the challenged ruling is not an isolated one. *See, e.g., Salazar*, 182 Ariz. at 609, 898 P.2d at 987 (reversing conviction when range of judge's rulings questioned because range of rulings not easily amenable to harmless error analysis); *Scott v. U.S.*, 559 A.2d 745, 752 (D.C.App. 1989) (harmless-error test inappropriate when the appearance of impropriety taints the entire proceeding). Thus, our ultimate conclusion here is similar to our conclusion in *Salazar*.

¶ 39 As opposed to *Salazar*, however, Mother does not argue that she risks injustice from all aspects of the dissolution decree. For example, she does not assert that she is in any danger of injustice from Judge Oberbillig's child-support order, his spousal-maintenance order or most aspects of his property division. Mother alleges that she was exposed to the risk of injustice by: 1) Judge Oberbillig's denial of her motion to continue and her request for the hard drive from Father's work computer; 2) his denial of her request that counseling be ordered for Father; 3) two of his orders pertaining to the conditions of joint parenting; and 4) his equal division of the equity in the family home.

¶ 40 Father argues that there is no risk of injustice to Mother in any of these decisions because the determinations are supported by the record. However, when a judge is subject to question for bias, there is insufficient insulation from the risk of injustice in simply applying an abuse-of-discretion standard to the questioned rulings. A judge subject to question for bias could well make decisions that, while influenced by bias, were still well within the broad range of discretion that a trial judge is afforded. Thus, the appropriate test in evaluating the risk of injustice in these circumstances is whether we can determine that the challenged decisions would have been substantially the same if made by a judge whose partiality was not reasonably subject to question. Once an appearance of impropriety has been established, the burden of making that showing belongs to the party who desires to preserve the decisions of a judge who was or should have been disqualified.

¶ 41 Discretionary decisions such as those of which Mother complains are the difficult, delicate and daily duty of family court judges. One judge will not necessarily exercise discretion in the same way as will another. But, given the family court's ability to observe the parties, its familiarity with the history of the case, and its expertise provided by experience, family courts are uniquely suited to make such decisions.

¶ 42 Judge Willrich reviewed and confirmed Judge Oberbillig's decisions in the course of her ruling on Mother's motion for new trial. Yet her minute entry makes plain that she viewed the new trial motion as a horizontal appeal and did not exercise her independent judgment in confirming Judge Oberbillig's decisions. She merely determined that his decisions were supported by substantial evidence. Mother is entitled to have a judge whose impartiality is not subject to question exercise independent judg-

ment in arriving at the determinations of which she complains unless we can determine on appeal that the challenged decisions would have been substantially the same if made by a judge whose partiality was not reasonably subject to question. We cannot do so here.

### 1. The Continuance and Father's Hard Drive

¶ 43 Father argues that Judge Oberbillig's decision to deny the trial continuance should be affirmed on appeal because Father agreed to restrictive pretrial custody arrangements so as to hasten a trial on the merits in light of Mother's allegations. Father points out that Mother had plenty of time to request the computer hard drive and depose him earlier in the pretrial proceedings but had failed to do so and already had the relevant information. Both Dr. Gray and Dr. Joy had copies of the internet files Mother copied from his computer; Dr. Gray, the Gilbert Police Department and the technician that copied the internet files all indicated the files did not contain child pornography. And Dr. Joy, while informed of the potential pornography issue, did not request Father's hard drive as necessary for her custody evaluation. Further, because he returned the computer to his employer, Father alleges the hard drive might reflect website viewing not attributable to him.

¶ 44 On the other hand, Mother points out that she had expert testimony that a correlation exists between extensive pornography viewing and personality disorders that can affect parenting, that Father's assertions that he only rarely viewed pornography were not verified by any source other than Father, and that those who do have addictions to pornography are often "in denial" about their problem. Mother asserts that Father tentatively agreed to provide his hard drive for inspection and that she brought her motion to continue as soon as Father's pledged cooperation was not forthcoming. Mother also argues that Father took his computer to work only after the dissolution action was filed and that his use could easily be isolated from any use of his co-employees. She adds that other financial discovery had been overdue from Father for almost four months, that

she wished to depose Father after obtaining the hard drive and the financial discovery, and that Dr. Joy had not yet provided her custody evaluation.

¶ 45 Given the procedural and factual posture in which the case now stands, we remand this matter for the exercise of independent judgment and consideration by a different division of the family court as to whether it would grant Mother's request for Father's hard drive under all the circumstances.

### 2. Additional Counseling for Father

¶ 46 There are reasons in the record justifying Judge Oberbillig's decision to not order additional counseling for Father. However, Dr. Joy recommended in her custody evaluation that "each parent continue with individual counseling to work on stress management, uncoupling and co-parenting." Further Dr. Holyoak testified at trial that Father had difficulty with intimacy issues. Thus, Judge Oberbillig's order, which did not require additional counseling for Father, is not the only reasonable course that a family court judge might have followed. As a result, we cannot say with reasonable certainty that another judge would have entered the same decision as Judge Oberbillig. Thus, the family court on remand must render an independent judgment whether either party or both parties should continue counseling.

### 3. Parenting Time

¶ 47 While Mother initially asserted on appeal that she risked injustice from the amount of parenting time Judge Oberbillig awarded Father, Father identified excerpts in the record in which Mother had acquiesced in the parenting time eventually awarded by Judge Oberbillig. Mother concedes as much in her reply brief. Thus, unless the trial court deems a reevaluation of parenting time necessary, it need not do so.

### 4. Alternative Care Provider of Choice

¶ 48 Dr. Joy, in her custody evaluation, recommended that either parent be designated the care provider of choice if the other were to be unavailable for more than four

consecutive hours. The trial court entered no such requirement. While the court was, of course, not required to accept the recommendation of Dr. Joy in this respect, another court might have acted reasonably in doing so. Thus, the family court judge on remand must exercise independent discretion in determining whether either parent will be the care provider of choice if the other is unavailable for more than four consecutive hours.

### 5. Medical and Education Decision Maker

¶ 49 Mother alleges that she should have been designated as the custodial parent with final decision-making authority regarding medical and educational issues. Dr. Joy recommended that both parties share such decisions and that is what Judge Oberbillig ordered. We cannot say, depending on its interpretation of the evidence in the record, that a reasonable trial court could not rule otherwise. Thus, the family court on remand must exercise independent judgment in determining whether either parent should be given final decision-making authority with respect to educational and medical issues.

### 6. The Division of the Equity in the Parties' Home

¶ 50 Finally, Judge Oberbillig equally divided the equity that the parties had in the community home. Mother's parents made a gift to the community in the amount of $100,000 on the couple's mortgage balance. While Mother concedes that gifts to the community should be equitably divided, she argues that an equitable division is not always an equal division pursuant to *Toth v. Toth*, 190 Ariz. 218, 221, 946 P.2d 900, 903 (1997). She thus asserts that because her parents paid down the mortgage so that she could be at home with her children, it would have been equitable for the trial court to have exercised its discretion to allocate more of the value of the home to her than to Father.

¶ 51 The facts here are readily distinguishable from those in *Toth*. Further, the court did award spousal maintenance to Mother expressly so that Mother could remain at home and parent the parties' young children. In the great majority of cases we would expect that gifts to the community would be equally divided as Judge Oberbillig did here. Yet another division of family court might have balanced the equities on these issues differently without abusing its discretion. We thus remand for an independent determination on these issues.

¶ 52 Nevertheless, a court is required in awarding spousal maintenance to consider "the financial resources of the party seeking maintenance, including marital property apportioned to that spouse." A.R.S. § 25-319(B)(9) (Supp.2004). Should the family court determine to reallocate the equity in the marital home, it may affect Mother's entitlement to spousal maintenance. If, on remand, the family court readjusts the division of equity awarded from the family home, we vacate the spousal-maintenance award subject to redetermination by the family court.

### C. Procedure on Remand

¶ 53 Although Mother complains of only certain aspects of Judge Oberbillig's determinations, the family court is not limited on remand to considering only those issues if its reconsideration of other issues is necessary to its exercise of independent discretion in entering a decree. Nevertheless, the parties earlier agreed on some issues, and they may now agree on others. As well, the family court may determine that the best interests of the children require that certain aspects of the existing decree not be modified. Accordingly, the family court is authorized to make its independent determination by reviewing the existing record or conducting further proceedings in whole or in part as it deems necessary.

¶ 54 Should the family court determine that it would have granted Mother's request for Father's hard drive, and should Mother, as a result, ascertain additional information relevant to Father's ability to parent, the family court should grant a new trial on the issues pertaining to parenting. To the extent that these issues also require reconsideration of any part of the remaining decree, the family court is authorized to reconsider and vacate any or all of the decree necessary to effectuate its own decree.

¶ 55 Should the family court independently deny Mother's request for the hard drive, it should nonetheless independently consider the issues presented by Mother and enumerated above. It may do so by reviewing the existing record, or, as we previously observed, it may rehear these issues in whole or in part. Again, to the extent that its consideration of these issues also requires reconsideration of part or all of the decree not questioned by Mother, including child support, spousal maintenance or property division, such matters, upon the determination of the family court, are vacated subject to its redetermination.

### D. Attorneys' Fees

¶ 56 Both Mother and Father have requested an award of attorneys' fees incurred in this appeal. We have the discretion to award attorneys' fees pursuant to A.R.S. § 25–324 (2000). In the exercise of our discretion we deny both requests.

### CONCLUSION

¶ 57 For the above reasons, we vacate and remand to the family court with the above instructions.

CONCURRING: SUSAN A. EHRLICH, Presiding Judge, and JOHN C. GEMMILL, Judge.