276 P.3d 527 (2012)
In the Matter of the ESTATE OF Marie Johanna LONG, An Adult.
Marie J. Long; Madelon Cloute; Jeanette Churchill; and Pat Christiansen, Plaintiffs/Appellants,
v.
Genevieve Olen; The Sun Valley Group, an Arizona corporation also doing business as Arizona Care Management; Brian Theut, Defendants/Appellees, and
Brenda Church, Intervenor/Appellee.
No. 1 CA-CV 10-0896.
Court of Appeals of Arizona, Division 1, Department E.
May 3, 2012.
As Amended May 7, 2012.
*528 Hunter, Humphrey & Yavitz, P.L.C. By Candess J. Hunter, Isabel M. Humphrey, Phoenix, Attorneys for Plaintiffs/Appellants.
Daniel R. Raynak, P.C. By Daniel R. Raynak, Phoenix, Attorney for Interested Parties.
Patricia A. Gitre, P.L.C. By Patricia A. Gitre, Phoenix, Attorney for Interested Parties.
Jon D. Kitchel, Scottsdale, Attorney for Marie Johanna Long.
Hill & Hill, P.L.C. By R. Corey Hill, Ginette M. Hill, Phoenix, and Ehmann DeCiancio, DeCiancio Robbins, P.L.C. By Christopher Robbins, Tempe, Attorneys for Defendant/Appellee Genevieve Olen.
Broening Oberg Woods & Wilson, P.C. By James R. Broening, Alicyn M. Freeman, Phoenix, and Warner Angle Hallam Jackson & Formanek, P.L.C. By Jerome Elwell, Phoenix, Attorneys for Defendant/Appellee The Sun Valley Group, d/b/a Arizona Care Management.
Lewis and Roca, L.L.P. By Jon Weiss, Shane E. Olafson, Phoenix, Attorney for Intervenor/Appellee Brenda Church.
WINTHROP, Chief Judge.
¶ 1 This appeal is brought on behalf of Marie Johanna Long, an elderly protected person, and by interested parties (three of Long's sisters) Madelon Cloute, Jeanette Churchill, and Pat Christiansen (collectively, "Appellants"), challenging the superior court's denial of Appellants' motion for new trial. Although the motion for new trial argued multiple grounds for a new trial, Appellants have presented only one issue for our review on appealwhether the superior court (the Honorable Robert A. Budoff, Judge) applied the correct legal standard in determining that ex parte communications between the probate court (retired Commissioner Lindsay B. Ellis) and various attorneys did not warrant a new trial.[1] In this opinion, we condemn the ex parte communications as wholly improper, but we find no legal error requiring reversal in the superior court's decision to deny a new trial. Accordingly, we affirm the court's denial of Appellants' motion for new trial.

FACTS AND PROCEDURAL HISTORY
¶ 2 In 1996, Long and her husband executed a revocable living trust agreement ("the trust" or "the Long Trust"). After her husband's death, Long named her niece, Genevieve Olen ("Olen"), and Olen's husband as successor trustees and sole remainder beneficiaries of the trust.[2] In May 2005, while residing in Scottsdale, Arizona, Long suffered a stroke. Olen assumed the role of trustee and agent under Long's financial and health care powers of attorney. Olen decided *529 that moving Long to San Diego, where Olen resided, would be in Long's best interest. The move to California, however, triggered a heated response from several of Long's relatives in Arizona.
¶ 3 Based in part on the recommendation of Long's physicians, Olen initially placed Long in an assisted living facility, where Olen anticipated Long's needs could be met without unduly taxing her financial resources. Olen also retained the services of a professional investment advisor, who placed the majority of the trust's assets in conservative investment funds.
¶ 4 After Long's stroke, Olen became aware that money had previously been withdrawn from Long's bank accounts and Long's sisters had removed $10,300 in cash from Long's home. Olen expressed concern that Long was easily influenced and family members were motivated by financial interests and unable to accept that Long was in need of protection and supervision. At the same time, some family members questioned Olen's motives.
¶ 5 Olen maintained that, as Long's acting trustee and agent, she was solely responsible for determining what was in Long's best interest. Nonetheless, in an effort to clarify her responsibilities, and in response to family members' continuing objections, Olen consulted with attorneys in California and Arizona. Olen then initiated guardianship proceedings in California. That court, however, ordered her to initiate the proceedings in Arizona. After requests from Long and Long's sisters, Olen eventually agreed to move Long back to Arizona.
¶ 6 In September 2005, Olen filed a petition for appointment as Long's guardian in Arizona. Long returned to her personal residence in Arizona, where she was provided with 24-hour caregivers, despite Olen's stated objections due to the high cost of such care. Olen continued to utilize Linda Batts, who had worked as Long's attorney for nearly ten years, as counsel for Long, and Batts was initially named as court-appointed counsel for Long. Olen also retained Brenda Church as Olen's Arizona counsel.[3]
¶ 7 During the course of the Arizona guardianship proceedings, an issue arose as to who represented Long. Daniel Raynak, Long's nephew-in-law, advised the probate court that Long had asked him to represent her. As a result, the court believed it necessary to appoint a guardian ad litem to make a recommendation as to the appropriate representation of Long. The court appointed Brian Theut in this capacity. The court later appointed Jon Kitchel to replace Batts as court-appointed counsel for Long. The probate court also appointed the Sun Valley Group ("SVG"), d/b/a Arizona Care Management, to temporarily serve as Long's Arizona guardian to oversee her care while the proceedings determining permanent guardianship were underway. SVG was later appointed as Long's permanent guardian and became Long's for-profit caregiver.
¶ 8 Objecting members of the Long family lodged numerous complaints about the actions and performance of Olen as trustee, including a motion to the court for appointment of a new trustee. These challenges generally were to Olen's financial management of the trust and her decision-making as fiduciary, but included objections related to the actions of SVG and Theut as well.[4] The objecting members of the Long family alleged that the overall expenditures from the trust were unreasonable, improper, or unauthorized. Olen continued to maintain that Long should be placed in an assisted living arrangement and her home sold, and she further contended the requirement of maintaining the personal residence and providing the 24-hour caregivers, together with the ongoing litigation that required the continual involvement of attorneys, resulted in monthly expenses of approximately $20,000 to the trust.[5] By late April 2008, the value of the trust had decreased from approximately $1.3 *530 million in 2005 to approximately $435,000. By the end of 2009, the assets in the Long Trust were depleted to practically nothing.
¶ 9 Beginning in July 2008, Olen filed several petitions for approval of accounting and fees for the years 2005 through 2008. These petitions and the objections of other family members eventually led to a series of hotly contested evidentiary hearings in the probate court, which began on August 7, 2009, and continued through December 1, 2009.[6] Commissioner Ellis presided over the hearings.[7]
¶ 10 On January 15, 2010, before she had issued her ruling, Commissioner Ellis retired, and her calendar was assigned to another probate commissioner, David O. Cunanan.[8] Additional petitions were filed relating to Olen's 2009 accounting.
¶ 11 On the morning of March 16, 2010, Commissioner Ellis electronically filed a minute entry ruling dated March 15 approving the accountings and finding that the blame for the diminution of the trust assets fell on the shoulders of the objecting family members and their lawyers:
[The objecting family members' attorneys] Raynak [and] Gitre and Kitchel contend that the losses suffered are evidence of misconduct and constitute a breach of Olen's fiduciary duty as Trustee. They cite the amount of attorneys' fees paid to Church as evidence that Olen failed to act in the best interests of Long. They do not contend that the time sheets were inaccurate or that the work was unperformed but that Olen somehow improperly incurred the fees. What Raynak, Gitre and Kitchel fail to recognize is that their litigious behavior and lack of compliance with probate rules and procedures created the evil against which they so loudly complained.
¶ 12 In the minute entry, the court detailed events demonstrating the level of hostility exhibited by certain members of the Long family against Olen. The court found that the objecting family members and their counsel had continuously interfered with Olen and the performance of her duties, and the constant conflict required Olen's counsel to intervene more frequently, resulting in higher attorneys' fees.
There can be no doubt that the fees and costs incurred by Olen exceed the norm. All of the fees were the direct result of performing her duties as Trustee in what can only be described as a family battlefield. Once she became a target of her family's rage, she was forced to rely more frequently on her attorneys for appropriate advice and direction. Once she became a defendant in the civil suit, litigation counsel also became necessary.[9] She had no alternative but to defend her actions in this case. And she was legally authorized to retain competent counsel to assist her. The attorneys' fees and costs paid to Church ($110,276.50) over four years of contentious guardianship and trust proceedings were compliant with Local Rule 5.7 and the Arizona Rules of Probate Procedure, Rule 33. They were all incurred for the benefit of Long, were reasonable, necessary and properly charged to the Trust as authorized by the express language of the Trust and Arizona law. The fees paid to Theut ($16,609.83) as GAL and Kitchel ($15,530.00) as Court Appointed Counsel were also reasonable, necessary and properly paid by the Trust. The Court approves the payments made by Olen for attorneys' fees.
¶ 13 Shortly before the probate court issued its substantive ruling, however, Commissioner *531 Ellis's judicial assistant sent an e-mail of the draft ruling to Church, Theut, and counsel for SVG, but not to counsel for Appellants.[10] The e-mail, sent on March 15, 2010, did not request comments, but Church responded by suggesting two minor factual changes to the draft.[11] The judicial assistant replied with an e-mail indicating the suggested changes would be made.[12]
¶ 14 The court's ruling issued the next morning was identical to the version the judicial assistant attached to the e-mail; however, the following day, March 17, the probate court electronically filed a nunc pro tunc minute entry dated March 16 correcting the factual errors Church had identified.
¶ 15 Two months later, on May 13, 2010, Church disclosed the March 15 e-mails and produced them to Appellants. Shortly after Church's disclosure, the presiding superior court judge assigned the case to Judge Budoff to determine whether the ex parte communications required a new trial. In June 2010, Appellants filed a motion for new trial, raising numerous issues. As a result of discovery, other e-mails between Church (and her staff) and Commissioner Ellis's staff were disclosed in August 2010. These e-mails, dated between January 8, 2009, and February 2, 2010, concerned only non-substantive administrative procedure and scheduling issues, and included inquiring whether Commissioner Ellis would still consider the 2009 petitions in a pro tem capacity after her retirement as she had previously announced to the parties.[13]
*532 ¶ 16 On October 26, 2010, the superior court (Judge Budoff) issued a detailed, eleven-page minute entry granting a new trial as to the 2009 accounting petitions (which had been approved without a further hearing and are not the subject of this appeal) but denying Appellants' request for a new trial on the 2005 through 2008 accounting petitions. In reaching its conclusion, the court acknowledged "that the ex parte communications create the perception of bias and prejudice" and found they were "a violation of Rule 2.9 of the Code of Judicial Conduct of the Arizona Supreme Court."[14] Nonetheless, the court found the perception alone insufficient "to warrant a conclusion that there was not a fair trial."
¶ 17 In its analysis, the superior court determined that the changes suggested ex parte by Church and adopted by Commissioner Ellis in her substantive ruling were "immaterial," and the ex parte communications unrelated to the ruling "were only related to scheduling issues and are inconsequential." The court also addressed a case cited by both parties, McElhanon v. Hing, 151 Ariz. 403, 728 P.2d 273 (1986), stating that the issue it presented "is whether or not the ex parte communications violated [Appellants'] opportunity for a fair trial with the appearance of impartiality." The court concluded that the appearance of impropriety in the case before it "has not been shown to impact the substance of the ruling or [Appellants'] right to a fair trial." The court further found "that the decisions made by Ellis are evidence-based, and the mere fact that Ellis was, to some extent, harsh in her comments concerning [Appellants] and their counsel is not a basis for a Motion for New Trial to be granted."
¶ 18 Additionally, the superior court examined "[t]he evidence of judicial bias alleged by [Appellants]," including the ex parte communications, the criticism of Appellants and their attorneys contained in Commissioner Ellis's March 16 minute entry, Commissioner Ellis's decision to dismiss the civil lawsuit, the approval of fees, and other rulings by Commissioner Ellis. The court found "a lack of evidence presented by [Appellants] to show bias and prejudice to the extent that the Motion for New Trial should be granted."
¶ 19 The superior court then recognized that "a new trial would be warranted to prevent a miscarriage of justice, or in the event this Court determined that the rights of the aggrieved party were materially affected." Reasoning that any finding of an appearance of impropriety or actual harm warranting a new trial must be evidence-based, however, the court found no such basis for a new trial:
This Court does not conclude that the misconduct of Ellis in having ex parte communications with counsel prejudiced Marie Long or the interested parties as the substantive communication occurred after the ruling was prepared, and no evidence has been presented to support [Appellants'] claim that the ruling was influenced in any way by the ex parte communications.
. . . . .

McElhanon notes that not only must justice be done fairly, but that it must be perceived as having been fairly done. However, such a holding does not require *533 reversal based on the mere appearance of impropriety. If it could have been shown to this Court by evidence that the rulings of Ellis were unduly influenced in any way by the ex parte communications, or by bias and prejudice, then the Motion for New Trial would be granted. However, as previously stated, there is no evidence to support such a finding.
Finally, the court noted that "[t]he unfortunate dissipation of the Long estate, which has been the result of ongoing litigation, is not a basis to vacate the Ellis ruling in full and for a new trial to be granted."
¶ 20 We have jurisdiction over Appellants' timely appeal. See Ariz.Rev.Stat. § 12-2101(A)(5)(a), (9) (West 2012).

ANALYSIS

I. The Merits
¶ 21 As previously stated, Appellants' only argument on appeal is that the superior court applied the wrong legal standard in denying their motion for new trial as to the 2005 through 2008 accounting petitions. Appellants maintain that, under McElhanon, a new trial is required whenever a judge engages in an impropriety that creates an appearance of bias or prejudice, regardless of whether there is any showing of actual harm. Although we agree the ex parte communications made in this case were clearly inappropriate, we disagree that the superior court misapplied McElhanon.
¶ 22 We will not overturn a superior court's decision to deny a motion for new trial absent a clear abuse of discretion. Delbridge v. Salt River Project Agric. Improvement & Power Dist., 182 Ariz. 46, 53, 893 P.2d 46, 53 (App.1994). The burden is upon the party seeking to overturn the ruling to show that the court abused its discretion. Harris v. Murch, 18 Ariz.App. 466, 467, 503 P.2d 821, 822 (1972). To find an abuse of discretion, we must determine there is no evidence that supports the superior court's conclusion, or the reasons given by the superior court must be "clearly untenable, legally incorrect, or amount to a denial of justice." Charles I. Friedman, P.C. v. Microsoft Corp., 213 Ariz. 344, 350, ¶ 17, 141 P.3d 824, 830 (App.2006) (citations omitted). We review de novo whether the superior court applied the correct legal standard in making its determination. See Pullen v. Pullen, 223 Ariz. 293, 295-96, ¶¶ 9-10, 222 P.3d 909, 911-12 (App. 2009).
¶ 23 Rule 59(a)(1), Ariz. R. Civ. P., provides that a new trial may be granted for "[i]rregularity in the proceedings of the court. . . whereby the moving party was deprived of a fair trial." "The right to a fair trial is a foundation stone upon which our present judicial system rests. Necessarily included in this right is the right to have the trial presided over by a judge who is completely impartial and free of bias or prejudice." State v. Neil, 102 Ariz. 110, 112, 425 P.2d 842, 844 (1967).
¶ 24 Both parties cite McElhanon as the seminal Arizona case regarding the effect of ex parte communications on the right to a fair trial. In McElhanon, after advising the parties that it would do so, the trial court initiated ex parte communications with the plaintiff and his counsel during the course of a trial. 151 Ariz. at 408, 728 P.2d at 278. Defense counsel made no objection before the communication, and the ex parte conversation was transcribed by a court reporter. Id. After the conversation, the court met with counsel for all parties in chambers, and the court reporter read aloud the transcript of the communication. Id. at 408-09, 728 P.2d at 278-79.
¶ 25 Our supreme court held that the ex parte conference was improper, reasoning that "no matter how pure the motive any ex parte contact may allow the judge to be improperly influenced or inaccurately informed." Id. at 409, 728 P.2d at 279 (citing In re Conduct of Burrows, 291 Or. 135, 629 P.2d 820, 826 (1981)). The supreme court declined, however, to reverse. Id. at 409, 413, 728 P.2d at 279, 283. In holding that the improper ex parte communications did not require reversal, the court examined whether prejudice could be presumed, and/or whether there was an appearance of impropriety from which actual prejudice resulted. Id. at 410-13, 728 P.2d at 280-83.
¶ 26 The court first noted that prejudice may be presumed "when a trial judge loses control of a case and allows counsel to engage in conduct that precludes a fair trial." *534 Id. at 410, 728 P.2d at 280 (citing Grant v. Ariz. Pub. Serv., 133 Ariz. 434, 454, 652 P.2d 507, 527 (1982)).[15] Recognizing that all improprieties had occurred outside the jury's presence and "[t]his was not a case where loss of control created a virtual mockery of the concept of a fair and impartial trial," the court concluded that the ex parte conference did not automatically invoke a rule of presumed prejudice. McElhanon, 151 Ariz. at 410-11, 728 P.2d at 280-81 (citations omitted).
¶ 27 Here, as well, the rule of presumed prejudice is inapplicable. Appellants concede that they make no argument in this regard. Further, in denying the motion for new trial, the superior court found that "each party had a full and fair opportunity to present their case to the Court," and that "[t]here was evidence to support [the probate court's] findings and decisions." Although, as in McElhanon, the proceedings here were highly contentious, these and other findings of the superior court support the conclusion that the record does not demonstrate the probate court lost control of the proceedings such that the concept of a fair trial was no longer possible. See id. at 410, 728 P.2d at 280.
¶ 28 Nonetheless, ex parte communications may "cast doubt upon the adversary system and give the appearance of favoritism" because such communications "are rarely on the record and, therefore, are usually unreviewable." Id. at 411, 728 P.2d at 281 (citing Burrows, 629 P.2d at 826). If so, they may establish an appearance of impropriety. Id. An appearance of impropriety requires reversal when (1) it threatens the integrity of the judicial process, such as "when a judge becomes so personally involved that there is an appearance of hostile feeling, ill will or favoritism toward one of the litigants," or (2) when "the impropriety actually prejudiced the result." Id. at 411, 413, 728 P.2d at 281, 283 (citing State v. Brown, 124 Ariz. 97, 100, 602 P.2d 478, 481 (1979)). The McElhanon court found that neither prong applied, concluding that "the judge never lost the appearance of impartiality" and "[t]he misconduct did not prejudice [the] defendant." Id.
¶ 29 In this case, the probate court's impermissible contacts are reviewable because the contacts at issue were preserved in the form of e-mails. Nonetheless, in denying the motion for new trial, the superior court found that the ex parte communications established an appearance of impropriety, although the court concluded that the impropriety did not result in actual prejudice to Appellants. The court reasoned as follows:
In the Long matter before this Court, the ex parte communication occurred after the trial, and after the ruling had actually been prepared, and the only change that had occurred as a result of the improper ex parte communication was immaterial to the substance of the ruling itself.
The fact that the lawyers who were in receipt of the ex parte communication did not disclose it for two months, and the fact that the judge never disclosed it, apparently, until after it was brought to the attention of other judicial officers, after the fact, is inconsequential to the substance of the ruling itself regardless of whether or not counsel and the Judge may have violated any of their ethical responsibilities.
The Court clearly understands [Appellants'] position that the ex parte communications to others, and not [Appellants] themselves, creates an appearance of impropriety, however, an appearance of impropriety itself in this case has not been shown to impact the substance of the ruling or [Appellants'] right to a fair trial.
¶ 30 On appeal, Appellants are unable to state how they are actually prejudiced by the improper contacts, and they do not quarrel on appeal with the superior court's finding that the ex parte communications did not actually harm them. They argue, however, that the court failed to properly analyze whether the appearance of improprietyand specifically the court's acknowledgment that "the ex parte communications create the perception of bias and prejudice"required reversal on the basis that the impropriety *535 threatened the integrity of the judicial process because Commissioner Ellis had "become[] so personally involved that there is an appearance of hostile feeling, ill will or favoritism toward one of the litigants." McElhanon, 151 Ariz. at 411, 728 P.2d at 281 (citing Brown, 124 Ariz. at 100, 602 P.2d at 481). Relying on a definition of "bias and prejudice" provided in State v. Hill, Appellants argue that "[b]ias and prejudice mean a hostile feeling or spirit of ill will, or undue friendship or favoritism, toward one of the litigants,"[16] a definition that they liken to the language of McElhanon. Consequently, they conclude that the superior court must have committed legal error in denying their motion for new trial.
¶ 31 The superior court, however, considered not only whether Appellants had suffered actual harm, but whether the appearance of impropriety warranted a new trial.[17] Further, the court's minute entry makes clear its conclusion that the misconduct did not threaten "the essential fairness of the entire proceeding." McElhanon, 151 Ariz. at 412, 728 P.2d at 282. Proof of hostile feeling, ill will, or favoritism requires something more than what the e-mails demonstrated in this case. The e-mails themselves are certainly improper and highly inappropriate, and the conduct of Commissioner Ellis and Church in this matter is unacceptable. Ellis's assistant should have known that she, as an extension of Ellis, could not engage in ex parte communications. Church should have known not to contact Ellis's judicial assistant without copying all parties in her communications. However, the e-mails themselves do not discuss or specifically imply helping Appellees or harming Appellants, or create the appearance of a bias that threatens the integrity of the judicial system, and the changes proposed by Church were immaterial to the substance of the probate court's ruling, which had already been prepared.[18]
¶ 32 In contrast, the ex parte communication engaged in by the trial court in McElhanon was arguably more egregious than that found here because the communication in that case occurred while trial was still in progress and critical legal rulings associated with the trial had not yet been made. 151 Ariz. at 409, 728 P.2d at 279. Further, in McElhanon, plaintiff's counsel sought to expand the subject of his improper ex parte conference with the judge by accusing the defendant and his counsel of perjury and subornation, thereby presenting the court with clearly prejudicial information. Id. Nonetheless, the McElhanon court declined to find that reversal was required, and we find our supreme court's reasoning instructive in this regard:
The parties have had more than their day in court. There comes a time when every case must end; otherwise, the process becomes more important than the resolution. We would not affirm the verdict if a significant appearance of judicial impropriety existed. However, we believe that given the long history of the case, reversal based on mere appearance of impropriety, without any actual prejudice, would significantly undermine the integrity of the judicial system. This sequel to the saga of the Hatfields and McCoys has had all the scrutiny that the judicial system can afford. It *536 is time to put an end to this affair unless the impropriety actually prejudiced the result.
Id. at 412-13, 728 P.2d at 282-83. Much like the parties in McElhanon, the parties in this case have had more than their day in court. Further, given that no reasonable probability exists that Appellants were prejudiced as a result of the ex parte communications, the process must end. Accordingly, we affirm the superior court's ruling.

II. Costs and Attorneys' Fees on Appeal
¶ 33 Neither party has requested attorneys' fees on appeal. We do, however, award Appellees their costs associated with this appeal, contingent on their compliance with Rule 21(a), ARCAP.

CONCLUSION
¶ 34 We do not condone the highly inappropriate conduct of Commissioner Ellis and the attorneys with whom she, through her judicial assistant, engaged in ex parte communications. Further, we agree that the dissipation of the Long Trust's assets, due in large part to the contentious and acrimonious nature of the proceedings, is inexcusable. Nevertheless, the superior court did not err in deciding that the improper ex parte conduct did not prejudice Appellants or violate their right to receive a fair trial, and that the appearance of impropriety created by the e-mails did not rise to a level requiring reversal. Consequently, we affirm the superior court.
CONCURRING: DIANE M. JOHNSEN, Presiding Judge and PATRICIA A. OROZCO, Judge.
NOTES
[1] The Long case has received substantial publicity, much of it supporting the conclusion that systemic defects have afflicted the Maricopa County probate court system. Over the last several years, however, the probate department has sought to improve its management of guardianship and conservatorship cases, and in June 2010, it commenced an internal assessment of its processes and procedures to enhance accountability, reduce costs, and improve services. A recent report from the National Center for State Courts lauds current efforts of the court to manage its staggering caseload. See David C. Steelman et al., Nat'l Ctr. for State Courts, Improving Protective Probate Processes: An Assessment of Guardianship and Conservatorship Procedures in the Probate and Mental Health Department of the Maricopa County Superior Court (Final Report August 2011).
[2] Olen is the daughter of Margaret Aultman, Long's other sister. In May 2006, Long removed Olen and her husband as remainder beneficiaries of the trust and designated her (Long's) sisters as remainder beneficiaries.
[3] As the proceedings became more contentious, Olen also retained the law firm of Hill & Hill, P.L.C. in 2009 to represent her in her capacity as trustee for the Long Trust.
[4] In May 2006, SVG, as the appointed permanent guardian, sought to have matters expedited and the parties referred to mandatory mediation in an effort to resolve some of these issues.
[5] Long's home was eventually sold, and she moved into assisted living.
[6] We note that more active judicial management by Commissioner Ellis likely would have reduced the litigation expenses in this case. Toward that end, the legislature has recently amended the statutory scheme governing probate proceedings, including accountings and disputes in probate court, in an effort to improve the probate process. See 2011 Ariz. Sess. Laws, chs. 285, 334, 354 (1st Reg. Sess.).
[7] In November 2009, Olen and SVG submitted notices of resignation as, respectively, trustee of the trust and Long's guardian.
[8] Commissioner Ellis nevertheless retained the authority to rule on the petitions in a pro tem capacity. In their opening brief, Appellants affirmatively state that they do not challenge the authority of Commissioner Ellis to rule on the 2005 through 2008 petitions, given that she conducted the hearings on those petitions.
[9] Objecting family members filed civil lawsuits against Olen in superior court and federal court raising the allegations that underlie this matter. The civil lawsuit in CV2009-017442 was dismissed by Commissioner Ellis.
[10] It appears that none of the attorneys who received the draft minute entry notified or otherwise forwarded it to opposing counsel.
[11] Church responded as follows:

I could not be happier.
But, there are a couple factual things that the Commissioner may want to correct.
P.5last paragraph: Long was actually returned to AZ by Olen AFTER the commencement of the AZ proceedings, as the CA court would not let Long leave CA until AZ accepted jurisdiction. The attorneys in CA and the court were very concerned about the actions of the family.
Also, P.5Dr. Willson was Court Appointed, not actually "retained" by Olen.
[12] The fact that the ex parte communications were made by Commissioner Ellis's staff is immaterial. A judge cannot avoid appearances of impropriety created by her staff. Kay S. v. Mark S., 213 Ariz. 373, 380 n. 7, ¶ 34, 142 P.3d 249, 256 n. 7 (App.2006) (citing former Ariz. R. Sup. Ct. 81, Canon 3(C)(2) ("A judge shall require staff, court officials and others subject to the judge's direction and control to observe the standards of fidelity and diligence that apply to the judge and to refrain from manifesting bias or prejudice in the performance of their official duties.")). The Arizona Code of Judicial Conduct was revised and reorganized in 2009, but these principles remain the same. See Ariz. R. Sup.Ct. 81, Canons 1 ("A judge shall uphold and promote the independence, integrity, and impartiality of the judiciary, and shall avoid impropriety and the appearance of impropriety."), 2 ("A judge shall perform the duties of judicial office impartially, competently, and diligently."), ER 2.3 (addressing issues of bias, prejudice, and harassment), 2.9 (addressing ex parte communication), 2.12 (addressing a judge's supervisory duties).
[13] The first set of e-mails occurring between Laura Sexton, Church's paralegal, and Robyn Brown, Commissioner Ellis's judicial assistant, began on January 8, 2009. In these e-mails, Sexton asked whether it was necessary to file a notice of hearing "as a non-appearance or appearance," and Brown responded. Additional e-mails occurred as follows:

On April 2, 2009, Sexton asked Brown whether a motion that Church filed would be included in an upcoming hearing. No response from Brown is found in the record.
On May 14, 2009, Sexton asked Brown whether a response and objection to a motion would be considered at the next hearing. Brown responded affirmatively, and Sexton replied, "Thank you for your response."
On August 6, 2009, Sexton notified Brown that two responses relating to the next day's hearing were not filed with the court on the same day they were noticed to interested parties. Sexton requested that Brown give Ellis copies of the responses in preparation for the next day's hearing.
On January 19, 2010, Sexton sent the following e-mail to Brown:
Our office filed two (2) Petitions on January 15th in the above referenced matter with regard to approval of final accounting, approval of Trustee fees, and discharge of Trustee; and a hearing was requested in front of Commissioner Ellis, however one was scheduled on February 16th at 9am in front of Commissioner Cunanan.
Is Commissioner Ellis no longer hearing any matters? Is there any way these Petitions may be presented in front of her as she is the most familiar with this matter?
Thanks so much[.]
On January 20, 2010, Brown responded, "Commissioner Ellis is retired as of 1/15. If there are no objections to the petitions Commissioner Cunanan will be able to handle them, otherwise she will handle them." Sexton e-mailed, "Thanks!" Brown responded, "Welcome."
On January 25, 2010, Church e-mailed Brown, and forwarded an e-mail from Gitre, opposing counsel. Church informed Brown that the e-mail from Gitre clarified that the Petition for Approval of Accounting and other related matters scheduled before Commissioner Cunanan would be contested. The e-mail suggested that Ellis and Cunanan "discuss this matter now to determine when and how the latest Petitions can be transferred to Commissioner Ellis." Brown responded that she would get the information to Ellis.
On February 2, 2010, Church e-mailed Brown, stating as follows:
Sorry to bother you with this. But, what is the status of the hearing on the 16th that was set before Cunanan. As you recall, you advised that Ellis would take it if it was contested and we have been advised that it is contested. Has it been moved to Commissioner Ellis. Or will it be moved after the hearing?
Brown responded that she would "check on this."
[14] Except in circumstances inapplicable here, "[a] judge shall not initiate, permit, or consider ex parte communications, or consider other communications made to the judge outside the presence of the parties or their lawyers, concerning a pending or impending matter." Ariz. R. Sup.Ct. 81, Canon 2, ER 2.9(A).
[15] For example, in Ice v. Commonwealth, a judge allowed the prosecutor to call a minister who testified that jurors would be condemned by God if they failed to recommend the defendant's execution. 667 S.W.2d 671, 676 (Ky.1984), cited in McElhanon, 151 Ariz. at 410, 728 P.2d at 280.
[16] 174 Ariz. 313, 322, 848 P.2d 1375, 1384 (1993) (citation omitted).
[17] Rather than finding that the record demonstrated an "appearance of hostile feeling, ill will or favoritism toward one of the litigants," McElhanon, 151 Ariz. at 411, 728 P.2d at 281, the superior court in this case instead found that "no evidence of deep-seated favoritism or antagonism exists in the evidence."
[18] Through Church, Appellees note that other appellate courts, although condemning the practice, have declined to reverse absent a showing of actual prejudice or harm to a party's substantial rights even when a trial court has allowed one party to "ghostwrite" a judicial opinion for the court without notice to the other party and an opportunity to be heard. See, e.g., Colony Square Co. v. Prudential Ins. Co. of Am. (In re Colony Square Co.), 819 F.2d 272, 275-76 (11th Cir. 1987); Burgess v. Stern, 311 S.C. 326, 428 S.E.2d 880, 882-84 (1993); Kroblin v. RDR Motels, Inc., 347 N.W.2d 430, 435-36 (Iowa 1984). Other courts have reversed when confronted with ghostwritten judicial opinions solicited by ex parte communications. See Chicopee Mfg. Corp. v. Kendall Co., 288 F.2d 719, 724-25 (4th Cir. 1961); WSC Corp. v. Int'l Harvester Co. (In re Wisconsin Steel Co.), 48 B.R. 753, 760-66 (N.D.Ill.1985). The situation presented here did not involve ghostwriting, and we strongly disapprove of such a practice. See generally W. Gillette, Inc. v. Ariz. Corp. Comm'n, 121 Ariz. 541, 543, 592 P.2d 375, 377 (App.1979) (citing Chicopee).