NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

STATE OF ARIZONA, *Appellee,*

*v.*

FRANK GALLAS MENDOZA, *Appellant.*

No. 1 CA-CR 23-0409

FILED 03-20-2025

Appeal from the Superior Court in Maricopa County
No. CR2018-005641-001
The Honorable Daniel G. Martin, Judge

**AFFIRMED**

COUNSEL

Arizona Attorney General's Office, Phoenix
By Joshua C. Smith
*Counsel for Appellee*

Maricopa County Public Defender's Office, Phoenix
By Damon A. Rossi
*Counsel for Appellant*

---

**MEMORANDUM DECISION**

Presiding Judge Kent E. Cattani delivered the decision of the Court, in which Judge Samuel A. Thumma and Judge Angela K. Paton joined.

---

**C A T T A N I**, Judge:

¶1　　　　Frank Gallas Mendoza appeals his conviction and sentence for first-degree murder.　For reasons that follow, we affirm.

**FACTS AND PROCEDURAL BACKGROUND**

¶2　　　　In December 2001, police responded to a welfare check request and found Robert dead in his home with head wounds and a ligature wrapped around his neck.[1]　Robert was naked, and there were sex toys near his body.　When processing evidence from the scene, the Department of Public Safety ("DPS") obtained multiple DNA profiles from sperm samples taken from Robert's abdomen, buttocks, back, face, thigh, penis, and mouth.　There were matching fingerprints from someone other than Robert on a box and a beer can, and the beer can contained biological evidence that yielded a DNA profile.　The DNA profiles from the can, the sperm found on Robert's body, and the torn part of the sheet tied as a ligature around Robert's neck matched each other, but did not match any profiles in the DNA database.　DPS investigated multiple leads, but the case eventually went cold.

¶3　　　　In 2018, DPS tied Mendoza to the crime after reinvestigating fingerprints from the beer can and box found at the crime scene using more advanced technology.　He thus became an investigative lead and later a suspect in the case.

¶4　　　　Using improved DNA technology, DPS found a partial match to the DNA profile from the ligature and from the sperm on Robert's back, buttocks, and mouth.　This partial DNA profile was consistent with coming from a close male relative of Frankie Mendoza (Mendoza's son), who had independently provided a buccal swab DNA sample to DPS.

¶5　　　　Detectives focused their investigation on Mendoza, who lived in Phoenix at the time of Robert's murder but was living in California in

---

[1]　　　We refer to the victim using a pseudonym.

2018. They suspected Mendoza was a flight risk and initiated several tactics to obtain his DNA. Additionally, in August 2018, DPS obtained Frankie's mother's DNA to secure more data relevant to the partial DNA match.

**¶6** DPS obtained a court order to put GPS trackers on Mendoza's cars in California, and on September 9, 2018, DPS investigators followed Mendoza's car and relayed their observations to a Fresno detective.

**¶7** Upon seeing Mendoza speed and make unsafe lane changes, the Fresno detective asked a California Highway Patrol ("CHiP") officer to make a traffic stop and, if he developed further reasonable suspicion, conduct a DUI investigation. After Mendoza took a field sobriety test that included a preliminary breath test ("PBT"), the officer concluded Mendoza was not impaired. Mendoza was allowed to leave, but CHiP retained the PBT tube. DPS's general counsel advised the DPS detective to get a search warrant to obtain the PBT tube from CHiP. With a warrant for the tube (but not for processing the saliva or DNA), DPS tested the saliva on the tube and derived a DNA profile that matched the most prevalent DNA profile from the crime scene.

**¶8** The State then presented the case against Mendoza to a grand jury. During the grand jury proceedings, the State did not present any evidence from the California traffic stop and DUI investigation, relying instead on the familial DNA evidence and the fingerprint match. The grand jury indicted Mendoza on one count of first-degree murder.

**¶9** Mendoza was arrested, and the State obtained a buccal swab from him. The DNA profile derived from the swab matched that developed from evidence found at the crime scene.

**¶10** Mendoza filed three motions to suppress the DNA evidence obtained through the California traffic stop and DUI investigation: (1) challenging use of GPS trackers, (2) challenging the search of the PBT tube, and (3) challenging the lawfulness of the DUI investigation. He also moved to disqualify all Maricopa County Superior Court judges. Mendoza's counsel explained that he planned to call as a witness Lisa Wahlin, who was the DPS general counsel who advised officers about the search warrant for the PBT tube and who had since been appointed as a judge of the Maricopa County Superior Court. Counsel asserted that Wahlin's testimony would be relevant in an evidentiary hearing on the motions to suppress. The superior court found one of the suppression motions was moot and denied the other two. The court also denied the motion to disqualify.

¶11         The jury convicted Mendoza of first-degree murder, and the court imposed a natural life sentence.  Mendoza timely appealed, and we have jurisdiction under A.R.S. § 13-4033(A)(1).

## DISCUSSION

¶12         Mendoza argues the superior court erred by denying his motion to disqualify all Maricopa County Superior Court judges.  He also argues the court erred when it denied his motions to suppress DNA evidence, which he asserts was obtained in violation of the Fourth Amendment because there was no reasonable suspicion justifying a warrantless search.

## I.       Motion to Disqualify All Maricopa County Superior Court Judges.

¶13         Mendoza argues the superior court erred by denying his motion to disqualify without addressing the motion on its merits.  We review the denial of this type of motion for an abuse of discretion.  *See State v. Perkins*, 141 Ariz. 278, 286 (1984), *overruled on other grounds by State v. Noble*, 152 Ariz. 284, 288 (1987); *cf. State v. Salazar*, 182 Ariz. 604, 607–08 (App. 1995).

¶14         Mendoza sought to disqualify all Maricopa County Superior Court judges because he intended to call Judge Wahlin as a witness at evidentiary hearings on his motions to suppress.  He asserted her testimony would be necessary to impeach the lead detective about legal advice Wahlin gave investigators in 2018 regarding the California DUI investigation when she served as general counsel for DPS.  In his motions to disqualify, Mendoza argued no judge on the Maricopa County Superior Court could properly assess Judge Wahlin's credibility because of their status as coworkers, creating an appearance of impropriety.

¶15         Mendoza filed his motion to disqualify after his PBT-tube suppression motion was fully briefed but before oral argument or an evidentiary hearing was held.  The motion to disqualify was assigned to the criminal presiding judge, who informed the parties the court would rule on the motion to disqualify after it was fully briefed.  Suppression motions remained with the judge assigned to try the case.

¶16         In June 2022, after argument on the PBT-tube suppression motion, the judge assigned to try the case denied the motion, found an evidentiary hearing was unnecessary, and found that the denial of the

motion without an evidentiary hearing meant Mendoza's motion to disqualify was moot.[2]

¶17      Mendoza filed a motion for reconsideration, which the court denied without a response. While the motion for reconsideration was pending, Mendoza filed his motion to suppress the same DNA evidence, this time challenging the lawfulness of the DUI investigation.

¶18      In early September 2022, the court held an evidentiary hearing on the DUI-investigation suppression motion. Without objection or renewed motion to disqualify, Mendoza called Judge Wahlin as a witness, and she testified at the hearing. After the court denied this suppression motion, Mendoza moved for a ruling on his motion to disqualify. The criminal presiding judge denied the motion, citing the June 2022 ruling by the judge assigned to try the case that the motion was moot, adding there was no motion to reconsider that ruling, so the issue was no longer pending. Mendoza then renewed his motion to disqualify, and the parties briefed the issue. The criminal presiding judge denied the renewed motion, finding it raised no new issues and noting Mendoza had not renewed his objection before calling Judge Wahlin to testify at the DUI-investigation suppression hearing.

¶19      Under Rule 1.2 of the Arizona Code of Judicial Conduct, "[a] judge shall act at all times in a manner that promotes public confidence in the independence, integrity, and impartiality of the judiciary, and shall avoid impropriety and the appearance of impropriety." Ariz. R. Sup. Ct. 81; Code of Jud. Conduct, Rule 1.2. Comment 5 to Rule 1.2 notes that "[t]he test for appearance of impropriety is whether the conduct would create in reasonable minds a perception that the judge violated this code or engaged in other conduct that reflects adversely on the judge's honesty, impartiality, temperament, or fitness to serve as a judge." *Id.* Rule 1.2, cmt. 5. Rule 2.11(A) of the Code requires a judge to disqualify himself or herself in any proceeding where the judge's impartiality might reasonably be questioned, including where the judge possesses personal knowledge of facts in dispute in the proceeding, where the judge worked for the government and participated personally and substantially in the proceeding, and where a

---

[2]      The State responded to the motion to disqualify (and moved to preclude Judge Wahlin's testimony) the day after the court filed its ruling denying Mendoza an evidentiary hearing and deeming the motion to disqualify moot. Mendoza then filed a reply to the State's response to his motion to disqualify about three weeks after the judge assigned to try the case found the motion was moot.

judge was a material witness concerning the matter. *Id.* Rule 2.11(A)(1), (6)(b), (c). "An appearance of impropriety requires reversal when (1) it threatens the integrity of the judicial process, such as 'when a judge becomes so personally involved that there is an appearance of hostile feeling, ill will or favoritism toward one of the litigants,' or (2) when 'the impropriety actually prejudiced the result.'" *In re Est. of Long*, 229 Ariz. 458, 465, ¶ 28 (App. 2012).

¶20        Mendoza arguably waived the appearance of impropriety issue by failing to object or renew his motion to disqualify before having Judge Wahlin testify at the September 2022 hearing on the DUI-investigation suppression motion. Waiver aside, there is a presumption of impartiality by the trial court. *State v. Menard*, 135 Ariz. 385, 387 (App. 1982). And here, there is no allegation that any judge, other than Judge Wahlin, was personally involved in Mendoza's case such that disqualification of the entire Maricopa County Superior Court bench would be required under Rule 2.11(A). And there was no allegation that the judge assigned to the case had an appearance of hostility, ill will, or favoritism toward Mendoza or the State. While Mendoza highlights the court's comment to Judge Wahlin after she testified ("I did four years on family court, so I know how busy you are. Condolences."), this does not show a close relationship between the judges or otherwise establish favoritism or partiality to either party in evaluating Judge Wahlin's testimony. Nor was Judge Wahlin asked about such an allegation when she testified.

¶21        Furthermore, Mendoza has not shown that any alleged appearance of impropriety had any bearing on his case. *See Est. of Long*, 229 Ariz. at 465, ¶ 28. The only DNA evidence at issue (the profile obtained from the PBT tube) ultimately was not introduced at trial, so there was no possible prejudice resulting from a Maricopa County Superior Court judge considering Judge Wahlin's testimony. On this record, Mendoza has shown no reversible error.

## II.    Motions to Suppress.

¶22        Mendoza argues the superior court erred by denying two of his motions to suppress the DNA profile obtained through the California DUI investigation: those challenging (1) the lawfulness of the DUI investigation and (2) the lawfulness of DPS's search of the PBT tube obtained during that investigation. He asserts that the superior court erred by denying the latter without holding an evidentiary hearing and erred on the merits by finding (1) reasonable suspicion to conduct the DUI

investigation and (2) that Mendoza abandoned any privacy interest he had in his "identifying characteristics" left in the PBT tube.

¶23    The Fourth Amendment prohibits unreasonable searches and seizures. *See* U.S. Const. amend. IV; *Terry v. Ohio*, 392 U.S. 1, 8 (1968). The exclusionary rule mandates suppression of evidence obtained in violation of the Fourth Amendment to deter future violations. *State v. Mitcham*, ___ Ariz. ___, 559 P.3d 1099, 1108, ¶ 32 (Ariz. 2024). The rule applies to evidence obtained directly from an illegal search and evidence later discovered because of the illegal search. *Id.* But an "independent source" exception to the exclusionary rule permits the admission of evidence discovered during or because of an unlawful search if the evidence was also obtained independently, by means untainted by the unlawful search. *Id.* at ¶ 34.

¶24    Here, Mendoza argues that the DNA evidence derived from the California DUI investigation was presented to the grand jury and used to secure his arrest and subsequent buccal swab, which provided the DNA profile used at trial. He thus argues the DNA profile derived from the buccal swab was the "fruit of the poisonous tree" and should have been suppressed. But even assuming (without deciding) the DNA profile from the California DUI investigation had been obtained unlawfully, the DNA profile used at trial was obtained independently.

¶25    Mendoza provides no grand jury transcripts to support his assertion that the DNA profile from the California DUI investigation was presented to the grand jury, and testimony from the evidentiary hearing on the DUI-investigation suppression motion belies this claim. Instead, the State linked Mendoza to DNA evidence from the crime scene through familial DNA. When detectives re-compared the crime scene evidence in 2018, they identified a fingerprint belonging to Mendoza. With this new lead, they compared the DNA profile from the scene to Mendoza's son, who the comparison identified as a close male relative of the person whose DNA was at the crime scene. The State relied on the fingerprint and familial DNA evidence during the grand jury proceedings, not the DNA from the California DUI investigation. And after the grand jury indicted Mendoza, law enforcement secured a warrant for his arrest, then obtained a buccal swab from him that was the source of the DNA evidence used at trial.

¶26    Because the evidence on which Mendoza's conviction rests was obtained independently and separately from the California DUI investigation, we need not address the alleged Fourth Amendment errors attendant to the DUI investigation because, even assuming error, any such error was harmless. *See id.*

## CONCLUSION

¶27        We affirm.

